# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DIGITAL MEDIA TECHNOLOGY HOLDINGS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>DIGITAL CINEMA DISTRIBUTION COALITION LLC,<br><br>Defendant. | C.A. No. 24-1321-CFC<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S ANSWERING BRIEF
## IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff Digital Media Technology Holdings, LLC ("Plaintiff"), through undersigned counsel, hereby responds to the Opening Brief in Support of Defendant's Motion to Dismiss the Complaint (D.I. 13, hereinafter the "Motion") filed by Defendant Digital Cinema Distribution Coalition LLC ("Defendant").

Dated: March 12, 2025

*Of Counsel:*

John C. Carey
**CAREY RODRIGUEZ LLP**
1395 Brickell Avenue, Suite 700
Miami, Florida 33131
(305) 372-7474
jcarey@careyrodriguez.com

Robert J. Katzenstein (No. 378)
Daniel A. Taylor (No. 6934)
**SMITH KATZENSTEIN JENKINS LLP**
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
rjk@skjlaw.com
dat@skjlaw.com

*Attorneys for Plaintiff*

# **TABLE OF CONTENTS**

TABLE OF CITATIONS ........................................................................... ii

I.    SUMMARY OF ARGUMENT .......................................................1

II.   ANSWERING COUNTERSTATEMENT OF FACTS ...................................2

    A.    Prosecution History of the '725 Patent                         2

    B.    Overview of the '725 Patent                                    4

    C.    The State of the Art as of May 2, 2000                         5

III.  ARGUMENT.................................................................8

    A.    Legal Standards                                                8

    B.    The Court Should Deny Defendant's Motion to Dismiss           16

        1.    All Claims of the '725 Patent Claim Eligible Subject Matter. .......16

IV.   CONCLUSION.............................................................23

# <u>TABLE OF CITATIONS</u>

**Cases**

*Alice Corp. Pty. v. CLS Bank Int'l,*
   573 U.S. 208 (2014) ................................................................9

*Ameritox, Ltd. v. Millennium Health, LLC,*
   2015 WL 728501 (W.D. Wis. Feb. 18, 2015) ......................................14

*Attentive Mobile Inc. v. 217 Labs, Inc.,*
   2023 WL 6215825 (D. Del. Sept 25, 2023) .........................................11

*Axcess Int'l, Inc. v. Genetec (USA) Inc.,*
   375 F.Supp.3d 533 (D. Del. 2019) ....................................................11

*Berkheimer v. HP Inc.,*
   881 F.3d 1360 (Fed. Cir. 2018) .................................................. 14, 21

*Chewy, Inc. v. Int'l Bus. Machs. Corp.,*
   94 F.4th 1354 (Fed. Cir. 2024) .................................................. 19, 22

*Diamond v. Diehr,*
   450 U.S. 175 (1981) .............................................................. 14, 22

*Elec. Power Grp., LLC v. Alstom S.A.,*
   830 F.3d 1350 (Fed. Cir. 2016) .................................................. 18, 22

*Enfish, LLC v. Microsoft Corp.,*
   822 F.3d 1327 (Fed. Cir. 2016) ......................................................10

*GeoComply Sols. Inc. v. Xpoint Servs. LLC,*
   2023 WL 1927393 (D. Del. Feb. 10, 2023) ..................................... 18, 22

*Guada Techs. LLC v. Vice Media, LLC,*
   341 F.Supp.3d 390 (D. Del. 2018) ..................................................8, 9

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,*
   566 U.S. 66 (2012) ..................................................................9

*McRO, Inc. v. Bandai Namco Games America, Inc., et. al.,*
   837 F.3d 1299 (Fed. Cir. 2016) ......................................................10

*US Synthetic Corp. v. International Trade Commission,*
   128 F.4th 1272 (Fed. Cir. 2025) .....................................................10

**Statutes**

35 U.S.C. § 101 .................................................................................8

35 U.S.C. § 282(a) ............................................................................8

**Rules**

Federal Rule of Civil Procedure 12(b)(6) .................................................8

Plaintiff asserts U.S. Patent No. 7,574,725 (the "'725 Patent") against Defendant's server-based platform for distributing multimedia materials and advertising materials in a manner that infringes the '725 Patent.  (D.I. 1 , ¶¶ 12, 16). Defendant contends that claims 1-12 of the '725 Patent are invalid under 35 U.S.C. § 101.  (D.I. 13 at 1-2).  However, the Complaint does not limit its allegations to a specific subset of the claims.  Because Defendant's Motion does not address all claims of the '725 Patent, it should be denied.

## I.    SUMMARY OF ARGUMENT

1.    Independent claim 1 is not representative of all claims in the '725 Patent.

2.    Defendant has not established that all claims of the '725 Patent fail under 35 U.S.C. § 101.

3.    The claims of the '725 Patent are ***not*** directed to an abstract idea for the following reasons:

    a. claims 1-12 of the '725 Patent are not directed to an abstract idea, but instead are directed to a specific method for distributing and displaying both multimedia material and advertising material that involves packaging multimedia material into "correlated information";

    b. claims 13 and 15-23 are not directed to an abstract idea for essentially the same reasons as claim 1-12; and

      c.  claim 14 is not directed to an abstract idea because it claims a specific collection of hardware components that operate together to display content to an audience at a particular time and place.

4.     If the Court finds that any of the claims of the '725 Patent are directed to an abstract idea, the Motion should be denied, because:

      a.  Defendant has not proven, by clear and convincing evidence, that the claims of the '725 Patent consist only of systems or methods that were conventional as of May 2, 2000; and

      b.  The '725 Patent claims contain, within the ordered combination of their elements, an inventive concept consisting of improvements in the distribution and display of multimedia and advertising material as of May 2, 2000.

## II.   ANSWERING COUNTERSTATEMENT OF FACTS

### A.   Prosecution History of the '725 Patent

1.     On April 23, 2001, the application that issued as the '725 Patent was filed with the USPTO, claiming priority to a provisional application filed on May 2, 2000.  (D.I. 1-1 at 1).

2.     During the prosecution of the '725 Patent, the USPTO rejected the

application six times and conducted four examiner interviews:[1]

      a.    on June 6, 2005, as anticipated and obvious (Ex. A at 91-121);

      b.    on November 28, 2005, as anticipated and obvious, and for indefiniteness (Ex. A at 145-178);

      c.    on August 23, 2006, as obvious (Ex. A at 223-251);

      d.    on February 8, 2007, as obvious (Ex. A at 261-277), followed by an Examiner Interview on August 3, 2007 (Ex. A at 278-79);

      e.    on October 16, 2007, as obvious (Ex. A at 298-325), followed by Examiner Interviews on January 16, 2008 (Ex. A at 326-27) and February 22, 2008 (Ex. A at 363-65); and

      f.    on December 3, 2008, as obvious (Ex. A at 441-468), followed by an Examiner Interview on March 13, 2009 (Ex. A at 474-75).

All of the above rejections were successfully traversed by the inventor.

3.    On April 8, 2009, the USPTO issued a Notice of Allowance with an examiner's amendment (Ex. A at 500-510), and on July 13, 2009, issued a Supplemental Notice of Allowability in response to an amendment filed on April 3, 2009 (Ex. A at 593-602).

---

[1] Exhibit A consists of the entire prosecution history of the '725 Patent, and all pin cites for Exhibit A refer to the PDF page number of the exhibit.

### B.    Overview of the '725 Patent

The '725 Patent, entitled "Multimedia Marketing and Distribution System," issued on August 11, 2009.  (D.I. 1-1 at 1).  The inventor is Nicholas Stiliadis (*id.*), who is the owner and CEO of Plaintiff.  The invention claimed in the '725 Patent relates to a novel manner of distributing and displaying multimedia material in conjunction with marketing material that is specifically associated with the multimedia material.

> 1. Field of the Invention
>    The present invention relates to the marketing and distri-
> bution of multimedia material, including digitally generated
> film, video, graphics and audio, and analogues traditional
> media converted into digital movie and television programs,
> and associated marketing materials for distribution over a
> computer network to exhibitors and broadcasters.

(D.I. 1-1 at 1:19-25).  The specification contemplates a variety of non-limiting examples of the "marketing materials":

> One embodiment of the invention will now be described in
> connection with the input of a movie entitled "ABC". Ini-        25
> tially, this movie is received on seventy-millimeter film (cel-
> luloid). The producer or owner of the movie also provides the
> operator of the inventive web site with advertising posters,
> newspaper advertisements, radio promotional spots on audio-
> cassette or compact disc, television promotional spots on      30
> video cassette or videodisc, trailers on celluloid or video
> cassette, a film strip comprising a coming events announce-
> ment, and text, such as all or portions of the script and critic's
> reviews. All of these materials and other types of materials
> that are normally transported physically from the owner, such   35
> as the producer or other owner of rights, to the person licens-
> ing the movie, are digitized and stored in storage media **28** in
> accordance with the invention.

(D.I. 1-1 at 5:24-38) (highlights added).

The specification states that, as of May 2, 2000, the state of the art in multimedia and advertising distribution had changed little in decades; motion

pictures were stored on reels of celluloid film and distributed via catalogue sales and

long-established relationships.

> The film and television industries have evolved over the years with the audiovisual image becoming omnipresent. Yet despite the incursion of the new technologies into many fields of business with the microchip and digital technology changing many aspects of modern life including marketing and distribution systems: the movie and television business remains largely unchanged still the motion picture and television industry today can benefit greatly by reducing overhead costs with the attendant improvement in profit margins. These overhead costs include the replication and distribution of hundreds of celluloid prints, of movies, videotapes, advertising materials and so forth.
>
> Today, these costs remain substantially of the same character and nature as when the industry was relatively young because the sale of audiovisual materials has undergone little change in decades. Typically, distributors through film markets, catalogue sales and long established relationships between purchasers and sellers, sell films.

(D.I. 1-1 at 1:35-52).

### C.     The State of the Art as of May 2, 2000

In the year 2000, only half of adults in the United States had internet access[2]

and, of those users, roughly 3-5% had access to broadband internet with roughly

30% having only "dial-up" internet access.[3]   The top three most popular websites

were AOL, Yahoo, and MSN, with Google not ranking even in the top three until

---

[2] See generally Internet/Broadband Fact Sheet
(https://www.pewresearch.org/internet/fact-sheet/internet-broadband/) (accessed Oct. 30, 2023)

[3] See Home Broadband 2013 at 2
(https://web.archive.org/web/20140112175146/http://www.pewinternet.org/~/media//Files/Reports/2013/PIP_Broadband%202013_082613.pdf) (accessed Oct. 30, 2023).

four years later in 2004.[4]  Amazon did not start streaming multimedia content until six years later in 2006,[5] followed by Netflix in 2007.[6]  Although the electronic distribution of multimedia material and advertising material may be ubiquitous today, it was essentially non-existent at the time of the priority date.

### D.    Concise Review of Claims 1-23

The '725 Patent contains twenty-three claims, with five independent claims: method claims 1, 13, 15, and 22, and apparatus claim 14.  (D.I. 1-1, 16:19-20:30).

Independent claim 1 claims a method for distributing and displaying both multimedia material and advertising material that involves packaging multimedia material with advertising material that is specifically associated with the multimedia material, together referred to as "correlated information," in such a way that facilitates the transfer of the "correlated information" from the multimedia owner in a way that allows a potential purchaser to sample both the multimedia material and advertising material, as well as obtain the multimedia and advertising material for physical display to third-party patrons of the purchaser.  (D.I. 1-1 at 16:19-17:3).

---

[4] See generally Animation: The Most Popular Website by Web Traffic (1993-2022) (https://www.visualcapitalist.com/cp/most-popular-websites-by-web-traffic/) (accessed Oct. 30, 2023).

[5] See generally What you need to Know About Amazon Prime: 2005-Today (https://pattern.com/blog/amazon-prime-timeline-from-2005-to-today/) (accessed Oct. 30, 2023).

[6] See generally Netflix's history: From DVD rentals to streaming success (https://www.bbc.com/news/newsbeat-42788099) (accessed Oct. 30, 2023).

For this novel packaging and distribution to occur, the invention leverages the use of networked server technology (*id.*), which had not been done before for this purpose. Dependent claims 2-12 comprise the same elements as claim 1, but with additional detailed limitations.

Independent claim 13 claims a method that tracks the limitations of claim 1, but includes a different limitation involving the transfer of licensing information associated with the multimedia material.  (D.I. 1-1 at 17:42-64).

Independent claim 14, being an apparatus claim, has a structure that is materially different from the other independent claims.  (D.I. 1-1 at 17:65-18:33). Claim 14 claims a specific collection of hardware components that operate together, such as a "first central processing unit" (*id.* at 17:67), a "first memory" (*id.* at 18:1-2), a "communications network" (*id.* at 18:3), an "input device" (*id.* at 18:6), a "second central processing unit" (*id.* at 18:12), a "second memory" (*id.* at 18:13), a "digital feature film projector" (*id.* at 18:19), a "screen" (*id.* at 18:21), and a "third memory" (*id.* at 18:26), all of which work together to display content to an audience at a particular time and place (*id.* at 18:22-24).

Independent claim 15 claims a method that tracks the technology of claim 1, but includes an additional limitation accommodating the live broadcast of the multimedia material and involving the charging of a fee to the purchaser.  (D.I. 1-1 at 18:34-65).  Dependent claims 16-21 comprise the same elements as claim 15, but

with additional detailed limitations.

Independent claim 22 claims a method that tracks the technology of claim 1, but includes at least an additional limitation involving the recordation and reporting of ticket sales data for billing purposes. (D.I. 1-1 at 19:24-20:26). Dependent claim 23 comprises the same elements as claim 22, but with additional detailed limitations.

## III.    ARGUMENT

### A.    Legal Standards

"A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations could not raise a claim of entitlement or relief." *Guada Techs. LLC v. Vice Media, LLC*, 341 F.Supp.3d 390, 393-94 (D. Del. 2018) (internal quotations omitted). By statute, "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims[.]" 35 U.S.C. § 282(a).

With respect to patent-eligible subject matter, the patent statute states: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. "The Supreme Court has recognized an implicit exception for three categories of subject matter not eligible for patentability—laws of nature, natural

8

phenomena, and abstract ideas." *Guada Techs.*, 341 F.Supp.3d at 394 (citing *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014)).  In 2016, the Supreme Court reaffirmed the two-step framework laid out in *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012) for the purpose of "distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014).

Here, Defendant contends that claims 1-12 of the '725 Patent are directed to an abstract idea.  (D.I. 13 at 5).

### 1.    *Mayo/Alice* Step One: Are the Claims "Directed To" an Abstract Idea?

At step one, a contested claim is not necessarily "directed to" an abstract idea just because abstract ideas are involved in the claim's subject matter, which is why the Court must look to the character of the contested claim as a whole:

> The "directed to" inquiry . . . cannot simply ask whether the claims *involve* a patent-ineligible concept, because essentially every routinely patent-eligible claim involving physical products and actions *involves* a law of nature and/or natural phenomenon – after all they take place in the physical world. Rather, the "directed to" inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether "***their character as a whole*** is directed to excluded subject matter."

*Enfish*, 822 F.3d at 1335 (citation and quotation omitted) (emphasis added).  When looking at the contested claim's character as a whole, one must take care not to

"oversimplify[] the claims by looking at them generally and failing to account for the specific requirements of the claims." *McRO, Inc. v. Bandai Namco Games America, Inc., et. al.,* 837 F.3d 1299, 1313 (Fed. Cir. 2016); *see also Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016)) ("[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.").

"The Supreme Court has not established a definitive rule to determine what constitutes an abstract idea sufficient to satisfy the first step of the *Mayo/Alice* inquiry." *Guada Techs.*, 341 F.Supp.3d at 395 (internal punctuation omitted). However, "[c]laims implemented purely in software are not necessarily directed to patent-ineligible abstract ideas under step 1." *Int'l Bus. Mach. Corp.*, 289 F.Supp.3d at 601.

The Federal Circuit recently framed the inquiry as "we are trying to ascertain as a matter of law whether a patent claim is directed to a specific implementation of an idea or merely just the idea itself." *US Synthetic Corp. v. International Trade Commission*, 128 F.4th 1272, 1283 (Fed. Cir. 2025). If the former, § 101 is satisfied at *Alice* step one. *Id*.

To assist in the step one analysis, "courts have generally sought to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Guada Techs.*, 341 F.Supp.3d at 394 (citation omitted). In *Axcess*

10

*Int'l, Inc. v. Genetec (USA) Inc.*, 375 F.Supp.3d 533 (D. Del. 2019), the Court denied

a Rule 12(b)(6) motion pursuant to § 101 for the following representative claim of

U.S. Patent No.: 7,286,158:

> A method of providing identity verification for access to a secure area,
>
> comprising:
>
>> eliciting a radio response from a radio frequency identification (RFID) tag at
>> an access door of a secure area;
>>
>> determining whether access by a wearer of the RFID tag to the secure area is
>> authorized based on the radio response;
>>
>> recording a video image of the wearer of the RFID tag at the access door;
>> and
>>
>> controlling access to the door to provide access to the secure area by the
>> wearer only if access by the wearer is authorized.

*Id.* at 535; *see also* Ex. B (*Axcess* patent).   The court rejected the defendant's

contention that the *Axcess* patent was directed to "the naked idea of monitoring and

controlling access to a location," instead finding that the patent is directed to "using

RFID equipment and video to remotely watch over, and limit access to, property,"

which is "a concrete application of an idea, the idea of keeping watch, and

specifically tethered to tangible equipment." *Id.* at 537.

In *Attentive Mobile Inc. v. 217 Labs, Inc.*, C.A. No. 22-1163-CJB, 2023 WL

6215825 (D. Del. Sept 25, 2023), the Court denied a Rule 12(b)(6) motion pursuant

to § 101 for the following representative claim of U.S. Patent No.: 11,416,887:

Claim 1 is a claim to a non-transitory processor-readable medium storing code that causes a click-to text server to do the following:

First, send to a client server an integration tag that is configured to be served with a webpage hosted by that client server;

the integration tag causes any mobile device that hosts that webpage via a first application to send user data to either the client server or the click-to-text server.

Second, once the mobile device executes the integration tag, the click-to-text server sends a uniform resource identifier [or 'URI,' which is a type of link] to the mobile device. This URI is described as deeplinking to a messaging application different from the first application;

the claim goes on to explain that once the mobile device detects the user interacting with a promotional message associated with the webpage then the URI causes the mobile device to automatically transition from the first application to the messaging application and automatically populate a custom message in the messaging application that includes an address associated with the click-to-text server and a message body that includes an identifier associated with at least one of the webpage or the user data;

the claim goes on to explain that once the mobile device detects that the user has hit the send button of the messaging app, then the mobile device sends the custom message to the click-to-text server.

Third, the click-to-text server receives the custom message. Fourth, the server then enrolls the mobile device in a promotion associated with the promotional message that the user accessed on the webpage.

*Id*. at *3; *see also* Ex. C (*Attentive Mobile* patent). The court rejected the defendant's contention that the *Attentive Mobile* patent was directed to the abstract idea of "streamlining the process for a customer to enroll in a marketing promotion by providing a pre-filled and pre-addressed request" (*id*. at *2), instead finding that the patent is directed to "a more particular way" of performing a conventional task. *Id*. at *4. ("[T]he patent's claims are not simply broadly about the concept of

12

streamlining a customer's enrollment process by providing a pre-filled and pre-addressed request in any old way one wishes to.  Instead, they are about doing so in a *more particular way*, one that must make use of what the patent refers to in shorthand as "Custom-Generated Deeplinks.").  The court also observed that the patent's background section discussed the preexisting need in the art for such an invention.  *Id*.

### 2.    Step Two: Is There an Inventive Concept?

If the Court determines that, in step one, the contested claims are directed to patent-ineligible subject matter, then in in step two "the court must look to the elements of the claim both individually and as an ***ordered combination*** to see if there is an inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself."  *Guada Techs.*, 341 F.Supp.3d at 394 (citing *Alice*, 134 S. Ct. at 2335) (internal punctuation omitted) (emphasis added).

Applying this step to the category of abstract ideas, "[a] claim that recites an abstract idea must include additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea."  *Guada Tech.*, 341 F.Supp.3d at 394 (citation and internal punctuation omitted).  For claims reciting computer hardware elements, "a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and

in common use before the combination was made." *Diamond v. Diehr*, 450 U.S. 175, 188 (1981).

In performing this analysis, the Court may look to the patent's written description. *See Ameritox, Ltd. v. Millennium Health, LLC*, No. 13-cv-832, 2015 WL 728501, at *23 n. 23 (W.D. Wis. Feb. 18, 2015) (relying on specification that identified problem in the field to find  inventive concept in the solution the patent provided).

### (a)    Clear and Convincing Evidence of Conventional Activities

"The second step of the *Alice* test is satisfied when the claim limitations involve more than performance of well-understood, routine, and conventional activities previously known to the industry. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018).  Although patent eligibility under § 101 is a question of law, "the question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field, which underlies the second step of the *Mayo/Alice* inquiry, is a question of fact." *Guada Techs.*, 341 F.Supp.3d at 394-95 (citation and internal punctuation omitted). "Any fact, such as this one, that is pertinent to the invalidity conclusion ***must*** be proven by clear and convincing evidence." *Id*. (emphasis added).

For example, the *Guada Techs.* court denied a Rule 12(b)(6) motion pursuant

to § 101 for the following representative claim of U.S. Patent No.: 7,231,379:[7]

> A method performed in a system having multiple navigable nodes interconnected in a hierarchical arrangement comprising:
>
> at a first node, receiving an input from a user of the system, the input containing at least one word identifiable with at least one keyword from among multiple keywords,
>
> identifying at least one node, other than the first node, that is not directly connected to the first node but is associated with the at least one keyword, and
>
> jumping to the at least one node.

341 F.Supp.3d at 393. The court found that the above claim was directed to an abstract idea but denied the motion on step two because "there exists a factual dispute as to whether the purported inventive concepts were well-understood, routine and conventional in 2002." *Id*. at 399-400 (internal punctuation omitted).

### (b)    Examples of Claim Elements Having Inventive Concepts

Courts have found inventive concepts in claims where the elements reveal "something more than 'conventional functioning' that targets and improves existing technological processes for a specific problem in field of the invention." *See Ameritox,* 2015 WL 728501 at *23 (holding that a method for urine screening that combined otherwise conventional steps to offer more accurate detection data was

---

[7] The Guada patent was later found invalid by the PTAB on obviousness grounds (IPR No. 2021-00875, 2022 WL 14136498), but that is not relevant to the § 101 analysis here.

patent eligible because it "solve[d] a unique problem with respect to drug testing technology").

## B.    The Court Should Deny Defendant's Motion to Dismiss

As a preliminary matter, claim 1 of the '725 Patent is not representative of all claims of the '725 Patent.  For example, at least independent claim 14 is significantly different from claim 1.

### 1.    All Claims of the '725 Patent Claim Eligible Subject Matter.

#### a.    *Alice* Step One: Claims 1-12 Are Not Directed to Abstract Ideas

Defendant makes a number of contentions on the "directed to" analysis. First, Defendant contends that claims 1-12 "are directed to the abstract idea of organizing, distributing, and marketing media content and related advertisements."  (D.I. 13 at 1).  Second, Defendant contends that claim 1 is directed to the abstract idea of "organizing media content by associating or correlating certain media with advertisements."  (D.I. 13 at 6).  Third, Defendant contends that claim 1 is directed to the abstract idea of "the distribution of media content and advertisements."  (D.I. 13 at 7).  Finally, Defendant curtly addresses claims 2-12 *ad seriatim* with conclusory, unsupported assertions that each dependent claim is "substantially similar and linked to the same abstract idea" as claim 1.  (D.I. 13 at 14-16).[8]

---

[8] Additionally, Defendant appears to improperly mix the step 1 and step 2 analyses by importing language regarding "conventional" computer components and business practices into the step one "directed to" analysis, when evidence of such

Defendant's contentions are wrong.

Independent claim 1 is directed to a novel technology for distributing and displaying both multimedia material and advertising material that involves packaging multimedia material with advertising material that is specifically associated with the multimedia material, together referred to as "correlated information," in such a way that facilitates the transfer of the "correlated information" from the multimedia owner to the purchaser in a way that allows a potential purchaser to sample both the multimedia material and advertising material, as well as obtain the multimedia material and advertising material for physical display to third-party patrons. (D.I. 1-1 at 16:19-17:3). As such, the claim is directed to a specific implementation, not an abstract idea. *See US Synthetic Corp.*, 128 F.4th at 1283.

Just as the representative claim in *Axcess Int'l* was directed to the "concrete application" of "using RFID equipment and video to remotely watch over, and limit access to, property[,]" *Axcess Int'l*, 375 F.Supp.3d at 537, here claim 1 of the '725 Patent is directed to a the concrete application of specific elements of computer

---

alleged "conventional practices" applies to the underlying questions of fact found in the step two "inventive concept" analysis. *See, e.g.*, D.I. 13 at 5 ("Thus, because claim 1 applies 'conventional computer components to well-known business practices,' it is directed to an abstract idea."); *see also id.* at 7 ("These steps are directed to an abstract idea because they simply apply conventional computer technology to the common business practices of storing media and transferring media from one party to another.").

hardware to package and distribute a combined product of multimedia material and advertising material, referred to as "correlation information" to facilitate the transfer of such information between owner and purchaser.  (D.I. 1-1 at 16:19-17:3).

Similarly, just as the claim in *Attentive Mobile* was directed to "a more particular way" of "providing a pre-filled and pre-addressed request" by way of "custom-generated deeplinks," *Attentive Mobile*, 2023 WL 6215825, at *4, here claim 1 of the '725 Patent is directed to a more particular way of distributing and displaying multimedia material to purchasers via "correlated information" packaging.  (D.I. 1-1 at 16:19-17:3).  As the written description in the *Attentive Mobile* patent disclosed the preexisting need in the market for an improved manner of providing a pre-filled and pre-addressed request, *Attentive Mobile*, 2023 WL 6215825, at *4, here, so too does the '725 Patent disclose how "the motion picture and television industry today can benefit greatly by reducing overhead costs" associated with "the replication and distribution of hundreds of celluloid prints, of movies, videotapes, advertising materials and so forth."  (D.I. 1-1 at 1:35-52).

Defendant's cited cases, as they pertain to *Alice* step one, are all distinguishable.  For example, in *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) and *GeoComply Sols. Inc. v. Xpoint Servs. LLC*, No. 22-1273-WCB, 2023 WL 1927393, at *4 (D. Del. Feb. 10, 2023) the representative claims were directed to abstract data processing operations, rather than a tangible

result. And in *Chewy, Inc. v. Int'l Bus. Machs. Corp.*, 94 F.4th 1354 (Fed. Cir. 2024), the claims at issue were "at most an improvement to the abstract concept of targeted advertising wherein a computer is merely used as a tool." *Id.* at 1366-77 (citing *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1365 (Fed. Cir. 2020)).

In contrast here, claim 1 of the '725 Patent recites "a method of marketing and distributing multimedia" (D.I. 1-1 at 16:19-20) resulting in the **tangible display** of multimedia material by exhibitors "in a public theater to a number of individuals" (*id.* at 16:58-17:2). Dependent claims 2-12, comprising the same elements as claim 1 but with additional limitations, are likewise not directed to abstract ideas.

### b.    *Alice* Step One: Claims 13-23 Are Not Directed to Abstract Ideas

Claims 13 and 15-23 are directed to essentially the same method as claim 1, but with slight modifications for specific embodiments. Thus, these claims are not directed to abstract ideas for the same reasons as stated above.

Independent claim 14, being an apparatus claim, has a structure that is materially different from the other independent claims. (D.I. 1-1 at 17:65-18:33). Claim 14 claims a specific collection of hardware components that operate together, including "first central processing unit," a "first memory," a "communications network," an "input device," a "second central processing unit," a "second memory," a "digital feature film projector," a "screen," and a "third memory," all of which

19

work together to display content to an audience at a particular time and place. (*Id.*).

Just as the claim in *Axcess Int'l* was directed to the "concrete application" of "using RFID equipment and video to remotely watch over, and limit access to, property[,]" *Axcess Int'l*, 375 F.Supp.3d at 537, here claim 14 of the '725 Patent is directed to a the concrete application of specific elements of computer hardware that work together to display content to an audience at a particular time and place. (D.I. 1-1 at 17:65-18:33).

Therefore, none of the claims of the '725 Patent is directed to an abstract idea.

### c.    *Alice* Step Two:  All Claims of the '725 Patent Contain an Inventive Concept

Defendant asserts that claim 1 lacks an inventive concept because it allegedly "describes common computer operations without providing a solution to a technological problem." (D.I. 13 at 12).  Specifically, Defendant asserts that (i) "the claimed steps of receiving, storing, providing, and downloading all have clear pre-computer analogs," (ii) "the specification describes no new technology at all and calls for using only known computer systems and networks to perform media organization, distribution and marketing." (D.I. 13 at 13).  Also, Defendant curtly addresses claims 2-12 *ad seriatim* with conclusory, unsupported assertions that each dependent claim adds "only insignificant limitations" to claim 1. (D.I. 13 at 14-16).

Defendant's contentions are wrong.

First, just as in *Guada Techs.* where the court denied a 12(b)(6) at step two of

the *Mayo/Alice* analysis because "there exists a factual dispute as to whether the purported inventive concepts were well-understood, routine and conventional in 2002[,]" *Guada Techs.*, 341 F.Supp.3d at 399-400, here, for ***all*** claims of the '725 Patent, there exists a factual dispute (which Plaintiff anticipates winning after conducting discovery) as to whether the Defendant's alleged "pre-computer analogs" or any such "known computer systems and network" existed at or before the priority date of May 2, 2000.  Here, the extensive, eight-year prosecution history of the '725 Patent, where many rejections under § 103 were successful traversed, would indicate that none of the allowed claims, in fact, consists purely of conventional elements.  *See Berkheimer*, 881 F.3d at 1367 (stating the Supreme Court has recognized that in making the § 101 determination, the inquiry "might sometimes overlap" with other fact-intensive inquiries like novelty under § 102).  Yet, Defendant's Motion offers no evidence of specific technology that it contends existed as of the priority date.  *See Guada Techs.*, 341 F.Supp.3d at 394-95 ("the question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field . . . is a question of fact.").

Second, none of the claims of the '725 Patent claims generic computer hardware.  Just because the language of computer hardware, such as servers and networks, appears in all claims of the '725 Patent does not imply that the '725 Patent

claims a "general-purpose computer" as Defendant contends. (D.I. 13 at 1). The '725 Patent's claims a method that, although implemented across various specific kinds of computer hardware, comprises a novel method of distribution and display between owner and purchaser by way of "correlated information." The fact that computer hardware is disclosed does not automatically eviscerate any existing inventive concept. *See Diamond v. Diehr*, 450 U.S. 175, 188 (1981) ("[A] new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made.").

Defendant's cited cases, as they pertain to *Alice* step two, are all distinguishable. For example, in *Elec. Power*, 830 F.3d at 1354-56 and *GeoComply*, 2023 WL 1927393, at *4, neither claim at issue recited an inventive concept, such as a new form of data processing, that would transform the abstract idea of data processing operations. In *Chewy*, 94 F.4th at 1366-68, the claims at issue recited computer processes that were conventional and generic at the time of the patent.

Here, claim 1 of the '725 Patent recites the inventive concept of using "correlated information" to identify "multimedia material" (D.I. 1-1 at 16:19-17:2), and claim 11 additionally recites "automatically collecting sales information" related to such multimedia material, none of which was a conventional or generic technology in May 2000.

22

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion should be denied.

Dated: March 12, 2025              Respectfully submitted,

*Of Counsel:*                      <u>*/s/ Daniel A. Taylor*</u>
                                   Robert J. Katzenstein (No. 378)
John C. Carey                      Daniel A. Taylor (No. 6934)
**CAREY RODRIGUEZ LLP**            **SMITH  KATZENSTEIN  JENKINS**
1395 Brickell Avenue, Suite 700    **LLP**
Miami, Florida 33131               1000 West Street, Suite 1501
(305) 372-7474                     Wilmington, DE 19801
jcarey@careyrodriguez.com          (302) 652-8400
                                   rjk@skjlaw.com
                                   dat@skjlaw.com

                                   *Attorneys for Plaintiff*

23

## <u>WORD COUNT CERTIFICATION</u>

The undersigned counsel hereby certifies that the foregoing document complies with the word count limitations as set forth in the Standing Order Regarding Briefing in all cases, D.I. 7, as it contains 4,972 words, which were counted by using the word count feature in Microsoft Word, in 14-point Time New Roman font.  The word count does not include the cover page, tables of contents and authorities, or the signature blocks.

*/s/ Daniel A Taylor*
Daniel A. Taylor (No. 6934)