# EXHIBIT A

Trials@uspto.gov                                              Paper 40
Tel: 571-272-7822                              Date: August 25, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————————

DISNEY MEDIA & ENTERTAINMENT DISTRIBUTION LLC,
Petitioner,

v.

DIGITAL MEDIA TECHNOLOGY HOLDINGS, LLC,
Patent Owner.

————————————————

IPR2024-00736
Patent 7,574,725 B2

————————————————

Before JAMESON LEE, SHEILA F. McSHANE, and LISA A. MURRAY,
*Administrative Patent Judges*.

MURRAY, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Granting Petitioner's Motion to Exclude
*37 C.F.R. § 42.64(c)*

IPR2024-00736
Patent 7,574,725 B2

# I. INTRODUCTION

We instituted *inter partes* review pursuant to 35 U.S.C. § 314 to review claims 1, 4–7, 9, and 11 of U.S. Patent 7,574,725 B2 ("the '725 patent") owned by Digital Media Technology Holdings, LLC ("Patent Owner"). We have jurisdiction under 35 U.S.C. § 6(c). This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons discussed below, Disney Media & Entertainment Distribution LLC ("Petitioner") has shown by a preponderance of the evidence that all the challenged claims of the '725 patent are unpatentable.

# II. BACKGROUND

Petitioner filed a petition requesting *inter partes* review of claims 1, 4–7, 9, and 11 of the '725 patent. Paper 2 ("Pet."). Patent Owner filed a Preliminary Response. Paper 8 ("Prelim. Resp."). Petitioner filed a Preliminary Reply, Paper 11, and Patent Owner filed a Corrected Preliminary Sur-Reply, Paper 14.

After considering the merits of the Petition and the arguments presented against institution by Patent Owner, we instituted *inter partes* review of all the challenged claims of the '725 patent on all grounds asserted in the Petition. *See* 37 C.F.R. § 42.108(a); Paper 15 (Decision Granting Institution ("Dec.")).

During the trial phase, Patent Owner filed a Response to the Petition. Paper 18 ("PO Resp."). Petitioner filed a Reply, Paper 27 ("Reply Br."), and Patent Owner filed a Sur-Reply, Paper 28 ("Sur-Reply Br."). Oral argument was held on July 9, 2025, the transcript of which is filed in the record. Paper 39 ("Tr.").

## A. Related Matters

The parties identify the following as a matter that may affect, or be affected by, a decision in this proceeding: *Digital Media Technology Holdings, LLC v. Disney Media & Entertainment Distribution LLC*, No. 2:22-cv-01642 (D.

IPR2024-00736
Patent 7,574,725 B2

Del.). Pet. 1; Paper 4, 1 (Patent Owner's Mandatory Notice); *see* Ex. 1019 (First
Amended Compl. (D. Del.)).

### B. The Patent-at-Issue

#### 1. Prosecution History

U.S. Application No. 09/840,283, filed on April 23, 2001, now U.S. Patent
No. 7,574,725 B2, claims priority to Provisional Application No. 60/201,118
filed on May 2, 2000. *See* Ex. 1001 codes (21), (22), (60) ('725 patent); Ex. 1004
('725 file history). During prosecution, the Examiner rejected claims of the '725
patent in three Non-Final and three Final Office Actions, resulting in six rounds
of claim amendments. *See generally* Ex. 1004. As issued on August 11, 2009, the
'725 patent contains twenty-three claims, of which claims 1, 13–15, and 22 are
independent. Ex. 1001 at 16:19–20:30.

#### 2. Overview

The '725 patent discloses a method of marketing and distributing
multimedia. Ex. 1001, 1:20–21. A central server storing multimedia material in
digital format, such as motion pictures and television programming, is connected
to a communications network, such as the Internet. *Id.* at 2:53–57, 3:13–17. In
addition to the base media, advertising materials can be downloaded from the
server system. *Id.* at 3:20–21. Exhibitors, such as theaters and television stations,
can access the central server, preview available programming and download the
programming along with marketing materials for the program or movie. *Id.*
at 2:60–65, 3:12–21. The exhibitors show the multimedia material in a public
theater to individuals in exchange for a paid admission, or are broadcast
exhibitors. *Id.* at 2:64–65. Finally, "[i]n addition to providing multimedia to
users, the server system collects data about the users and information respecting
the economics and sales success of exhibitors and broadcasters." *Id.* at 3:22–25.

3

IPR2024-00736
Patent 7,574,725 B2

Figure 1 of the '725 patent is illustrative and is reproduced below.



Ex. 1001, Fig. 1. As shown above, Figure 1 is "a block diagram generally illustrating the inventive system for marketing and distributing multimedia products." *Id.* at 3:39–41. In the illustrated embodiment, "the system exchanges information through the use of cyberspace 12, which may be either a private computer-based communications system or a public system, such as that known under the alleged trademark the Internet." *Id.* at 4:5–9. Multimedia producer 14 is linked to central server 16 which functions as a distribution web site. *Id.* at 4:10–12. "Multimedia producer 14 may also be connected to central server 16 via a private network link 20, thus providing either a faster data link, a more secure link, or both." *Id.* at 4:13–16. "Similarly, a plurality of exhibitors, including a movie theater 18*a*, a television station 18*b*, a satellite television operator 18*c*, a cable television operator 18*d*[,] and a high school 18*e*, are also connected through cyberspace 12 to central server 16." *Id.* at 4:20–23.

IPR2024-00736
Patent 7,574,725 B2

*C. Illustrative Claim*

Of the challenged claims of the '725 patent, only claim 1 is independent. Each of the remaining claims depends directly from claim 1. We reproduce claim 1 below, which is illustrative:

1. A method of marketing and distributing multimedia, the method comprising:

a. receiving, by a server, multimedia material and advertising material from a producer or owner of said multimedia material, said advertising material being associated with said multimedia material, said advertising material comprising audio and video components;

b. storing said multimedia material and associated advertising material on a computer readable storage medium as correlated information in digital format;

c. providing a server system accessible over a communication network, said server system accessing said correlated information in a digital format from said computer readable storage medium for transfer of said correlated information in a digital format over said communication network to potential purchasers;

d. providing samples of said correlated information in a digital format from said server system over said communication network to said potential purchasers, said purchasers being linked to the server system through said communication network;

e. downloading to said purchasers, upon request of said purchasers, over said communication network, said correlated information in a digital format corresponding to said multimedia material from said server system, said purchasers storing downloaded correlated information in a digital format corresponding to said multimedia material; and

f. providing said correlated information in a digital format corresponding to said advertising material that is associated with said multimedia material to said purchasers from said server system over said communication network, allowing purchasers to locally market and sell said multimedia material, said purchasers downloading said correlated information in a digital format corresponding to said advertising material that is associated with said multimedia material,

5

IPR2024-00736
Patent 7,574,725 B2

said purchasers storing the downloaded correlated information in a digital format corresponding to said advertising material; and

g. wherein said purchaser is an exhibitor exhibiting said multimedia material, after deriving said multimedia material from said stored correlated information in a digital format corresponding to said multimedia material, in a public theater to a number of individuals in exchange for a paid admission or a broadcast exhibitor, said advertising material, after deriving of said advertising material from said correlated information in a digital format corresponding to said stored associated advertising material, being shown to the public at a time or in a place different from the time or place at which said associated multimedia material is displayed.

Ex. 1001, 16:19–17:2.

### D. Asserted Grounds and Testimony of Record

Petitioner asserts the following prior art references:

| Reference | | Effective Date | Exhibit |
|---|---|---|---|
| Budow | US 5,521,631 | May 28, 1996 | 1008 |
| Garfinkle | US 5,530,754 | June 25, 1996 | 1005 |
| Allen | US 5,909,638 | June 1, 1999 | 1006 |
| Kosten | "Digital Distribution: A Coming Attraction," *Film J. Int'l* (Sept.–Dec. 1999) | Sept. 1999 | 1007 |

*See* Pet. 6–11.

Petitioner asserts the following grounds of unpatentability:

| Ground | Claims | 35 U.S.C. § | References |
|---|---|---|---|
| 1 | 1, 4–7, 9 | 103(a)[1] | Garfinkle, Kosten |
| 2 | 11 | 103(a) | Garfinkle, Kosten, Allen |
| 3 | 1, 4, 6, 7, 9, 11 | 103(a) | Allen, Budow |
| 4 | 5 | 103(a) | Allen, Budow, Kosten |

---

[1] The relevant sections of the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011), took effect on March 16, 2013. Because the application for the '725 patent was filed before the effective date of the relevant amendment, the pre-AIA version of Section 103 applies.

6

IPR2024-00736
Patent 7,574,725 B2

Pet. 3.

Petitioner also relies on a Declaration of Dr. Henry H. Houh, who is proffered as an expert in the field of "web based systems, streaming multimedia systems, distributed systems, and network architectures." Ex. 1002 ¶ 24. Dr. Houh also provided a Supplemental Declaration. Ex. 1022. In addition, Petitioner relies on a Declaration of June Munford regarding the authenticity and public availability of certain documents. Ex. 1014.

Patent Owner relies on a Declaration of Mr. Nick Stiliadis, the named inventor on the '725 patent. Ex. 2109. Patent Owner further relies on the declarations of Mr. John Daniels, an entrepreneur with a background in engineering physics (Ex. 2121), and Mr. Harris E. Tulchin, an entertainment attorney (Ex. 2131). There is a pending motion to exclude the declarations of Mr. Daniels and Mr. Tulchin on the basis that neither witness qualifies as a person of ordinary skill in the art. Paper 33 ("Pet.'s Mot. to Exclude"). We discuss this motion in Section II.E.2 below.

*E. Level of Ordinary Skill in the Art*

To determine whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966). Various factors may be considered, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *In re GPAC, Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (citing *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962–63 (Fed. Cir. 1986)). "[O]ne or more factors may predominate." *Id.*

7

IPR2024-00736
Patent 7,574,725 B2

*1. Determination of the Level of Ordinary Skill in the Art*

Petitioner argues that one of ordinary skill in the art at the time the invention was made "would have had a bachelor's degree in electrical engineering, computer engineering, computer science, or a related field, and at least one year of experience in the field of multimedia processing or communication networks, or the equivalent, with additional education substituting for experience and vice versa." Pet. 5–6.

In its Preliminary Response submitted prior to institution of trial, Patent Owner contended that a person of ordinary skill in the art did not require a technical degree. *See* Dec. 8–9. In its Response, Patent Owner revised its position. PO Resp. 11. Patent Owner now proposes the following level of skill for a person of ordinary skill in the art: "Bachelor of Science in electrical engineering, engineering physics, computer engineering, computer science, or a related field plus one year of experience related to marketing and distribution of multimedia material over a computer network, or the equivalent." *Id.* Patent Owner contends that its current proposal is "substantially the same as" the definition adopted by the Board in the Decision on Institution. *Id.*

In our Decision on Institution, we adopted the following definition of the level of skill for one of ordinary skill in the art: "a Bachelor of Science degree in electrical engineering, computer engineering, computer science, or a related field plus one year of experience related to marketing and distribution of multimedia material over a computer network, or the equivalent." Dec. 9. Patent Owner's proposed definition differs from the Board's only in that it adds a Bachelor of Science in engineering physics to the list of degrees that one of ordinary skill in the art might possess. *See id.* We view engineering physics as being related to the fields of electrical engineering, computer engineering, and computer science. Accordingly, following a review of the full record, we view Patent Owner's

IPR2024-00736
Patent 7,574,725 B2

proposed definition in its Response as consistent with the '725 patent and the asserted prior art, and we apply it in our analysis below.

### 2. Petitioner's Motion to Exclude

Petitioner has filed a motion to exclude from evidence the declarations of Mr. Daniels (Ex. 2121) and Mr. Tulchin (Ex. 2131) on the basis that neither witness possesses the requisite level of skill in the relevant art, as identified above.[2] Petitioner argues that: (1) Mr. Daniels and Mr. Tulchin are not persons of ordinary skill in the art ("POSITAs"); (2) non-POSITA expert declarations are inadmissible because they fail to meet the requirements of Fed. R. Evid. 702; and (3) even if the declarations were relevant, the risk of confusion would outweigh any alleged probative value that they might have, and therefore the declarations should be excluded under Fed. R. Evid. 403. Paper 33, 1 ("Mot. to Exclude"). Patent Owner opposes the Motion to Exclude, with Petitioner filing a Reply to the opposition. Papers 34, 37.

Our reviewing court has held that if a declarant fails to qualify as a person of ordinary skill in the art, then that person's testimony regarding the knowledge or motivations of one of ordinary skill in the art is irrelevant as a matter of law. *Kyocera Senco Indus. Tools Inc. v. International Trade Comm'n*, 22 F.4th 1369, 1377–78 (Fed. Cir. 2022) ("To offer expert testimony from the perspective of a skilled artisan in a patent case—like for claim construction, validity, or infringement—a witness must at least have ordinary skill in the art. Without that skill, the witness' opinions are neither relevant nor reliable."). Mr. Daniels' declaration consists of an analysis of the cited prior art in comparison to the challenged claims and a discussion of whether there would have been a

---

[2] The motion does not seek to exclude the declaration of the named inventor of the '725 patent, Nick Stiliadis. *See* Ex. 2109 (Stiliadis Declaration).

IPR2024-00736
Patent 7,574,725 B2

motivation to combine the prior art. Ex. 2121 ¶¶ 4–20. Mr. Tulchin's declaration addresses claim construction issues. Ex. 2131 ¶¶ 5–35. Each declarant, therefore, addresses issues that must be considered from the vantage point of a POSITA at the time of the invention, meaning a person with the level of ordinary skill defined in Section II.E.1 above. *See Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) (claim construction); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (obviousness). If Mr. Daniels and Mr. Tulchin do not qualify as POSITAs, as Petitioner alleges, then their opinion testimony is inadmissible under Federal Rules of Evidence 702 (Testimony by Expert Witnesses).

We find that there is insufficient evidence in the record to establish that Mr. Daniels qualifies as a POSITA in relation to the '725 patent. Mr. Daniels has an undergraduate degree in engineering physics in addition to a law degree. Ex. 2121 ¶ 2. His declaration, however, does not establish that he also has "one year of experience related to marketing and distribution of multimedia material over a computer network, or the equivalent." *See* Section II.E.1 above. Mr. Daniels characterizes his non-legal work experience as follows:

> The rest of my professional career has been spent working in my own companies in the research, development and prototyping/commercialization of a number of different technologies, principally including fishing rod technology, digital video file transport, storage and processing, LED-based light-emitting tapes, drone control systems, wearable medical related electronic devices and breath-based diagnostic devices.

Ex. 2121 ¶ 3; *see also* Ex. 1023, 99 (Daniels Deposition) (describing work on "a suite of interactive television innovations," including "the first working pause button"). None of the projects identified appears to relate to "marketing and distribution of multimedia material over a computer network."

Patent Owner argues that Mr. Daniels "was involved (at the time of the filing of the application which matured into the '725 patent) in making

IPR2024-00736
Patent 7,574,725 B2

inventions, that dealt with interactive television, video pause buttons and video file provision over the Internet." Sur-Reply Br. 6. However, neither Mr. Daniels' declaration nor his deposition testimony assert that he ever worked on "video file provision over the Internet," let alone that he did so for one year or more. *See* Ex. 2121 ¶ 3; Ex. 1023, 98–100. We find that the evidence in the record is not sufficient for us to conclude that Mr. Daniels qualifies as one of ordinary skill in the art.

We further find a lack of evidence establishing that Mr. Tulchin qualifies as a POSITA in relation to the '725 patent. Mr. Tulchin is an entertainment lawyer. Ex. 1028, 8:23–24. He is also involved in "motion picture production finance and distribution." *Id.* at 8:24–25; *see also* Ex. 2131 ¶ 4. He has earned a Bachelor of Science in industrial labor relations as well as a law degree, but he does not have a technical degree. Ex. 1028, 10:2–17. In his declaration, he acknowledges that he has "no specialized computer science training." Ex. 2131 ¶ 10. Mr. Tulchin therefore has neither the educational background of a POSITA, as defined above, nor, as far as the record evidence indicates, the requisite one year of experience in "marketing and distribution of multimedia material over a computer network." *See* Section II.E.1 above. While there is evidence that Mr. Tulchin is highly knowledgeable about the movie industry in general, there is insufficient evidence to conclude that he meets our determined definition of a POSITA. Accordingly, we grant Petitioner's Motion to exclude the declarations of Mr. Daniels and Mr. Tulchin from evidence.

## III. CLAIM CONSTRUCTION

In an *inter partes* review proceeding based on a petition filed on or after November 13, 2018, such as this, we construe claims using the same claim construction standard that would be used in a civil action under

11

IPR2024-00736
Patent 7,574,725 B2

35 U.S.C. § 282(b), as articulated in *Phillips*, 415 F.3d at 1303, and its progeny. *See* 37 C.F.R. § 42.100(b).

Patent Owner's claim construction arguments in its Response to the Petition, *in toto*, read as follows:

A. "Exhibition" – a public showing.

B. "Exhibitor" – one in the exhibition business.

C. "Broadcast Exhibitor" – one in the business of over-the-air broadcasting

D. "Distribution" – the business of marketing films and providing copies to venues

E. "Marketing" – actions taken to interest individuals in seeing a film.

F. "Storing" – electronically saving on a non-volatile storage element.

PO Resp. 10. The Response contains no citations to intrinsic evidence that might support Patent Owner's constructions. *See Phillips*, 415 F.3d at 1314 (the proper definition is the "definition that one of ordinary skill in the art could ascertain from the intrinsic evidence in the record") (quoting *Unitherm Food Sys., Inc. v. Swift–Eckrich, Inc.*, 375 F.3d 1341, 1351 (Fed. Cir. 2004)). Nor do Patent Owner's briefs cite to any extrinsic evidence.[3] Patent Owner's Sur-Reply contains a section with the heading "Claim Construction and Insufficiencies of

---

[3] We note that even if Patent Owner had cited to Mr. Tulchin's declaration or deposition testimony in support of any proposed claim construction, Mr. Tulchin is not qualified to opine on claim construction in this proceeding because he does not possess the requisite level of ordinary skill in the relevant art. *See Phillips*, 415 F.3d at 1314 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."); *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998) ("It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed.").

IPR2024-00736
Patent 7,574,725 B2

the Prior Art." Sur-Reply Br. 7–16. The section, however, does not present any support, intrinsic or extrinsic, for Patent Owner's proposed claim constructions, focusing instead on the reasons why the prior art allegedly does not disclose "distribution" or "storage" or an "exhibitor," as Patent Owner proposes to construe those terms. *Id.* at 13–16. Thus, Patent Owner has identified no evidence in the record to support its position that the claim terms listed above should be construed as narrowly as Patent Owner proposes.

Petitioner argues that no term requires explicit construction to resolve the grounds presented in the Petition, and provides several reasons why Patent Owner's proposed constructions should not be adopted. Reply Br. 2–11. Petitioner argues that if any of the terms identified by Patent Owner are construed, they should have the following meanings:

"Exhibition": According to Petitioner, "Claim 1 does not include an "exhibition" step, but dependent Claim 5 recites 'the exhibition of multimedia is the public showing of a motion picture.' . . . Under the doctrine of claim differentiation, broader independent Claim 1 is not so limited." Reply Br. 9 (citing Ex. 1001, code (57), 1:20–25, 2:64–65, 3:23–26, 4:20–27, 6:8–10, 11:64–12:4, 12:38–44, 15:46–60, 16:58–63, 17:14–15, Fig. 1).

"Exhibitor": According to Petitioner, "the term 'exhibitor' must be construed—if at all—broad enough to cover entities not specifically 'in the exhibition *business*.'" *Id.* at 7 (citing Ex. 1001, Fig. 1, 4:20–27, 12:38–44 (disclosing that exhibitors may include "schools, libraries, and other non–profit organizations")).

"Broadcast Exhibitor": Petitioner argues that "'Broadcast exhibitor' should be construed—if at all— broad enough to encompass the disclosed embodiments, including various exhibitors that may not conduct 'over–the–air' broadcasting

IPR2024-00736
Patent 7,574,725 B2

(e.g., satellite and cable television operators), and not limited to a particular business context." *Id.* at 8–9 (citing Ex. 1001, 4:20–23, 16:58–63, Fig. 1).

"Distribution": Petitioner further argues that "'distribution' should be construed—if at all—broad enough to encompass the disclosed embodiments, which include the distribution of other types of multimedia to any type of exhibitor contemplated in the specification and the technical steps required for distribution as recited in the claims and specification. The construction should also not be limited to a particular business context and cannot be understood to exclude 'downloading.'" *Id.* at 6 (citing Ex. 1001, Abstract, 1:20–25, 2:48–51, 3:17–19, 16:19–20).

"Marketing": According to Petitioner, "'marketing' should be construed—if at all—broad enough to encompass generally creating interest in a public showing or broadcast of some multimedia content." *Id.* at 4 (citing Ex. 1001, 4:20–27, 12:38–44, 16:58, Fig. 1).

"Storing": Finally, Petitioner contends that "'storing' should be construed—if at all—broad enough to encompass appropriate data storage media regardless of whether it is volatile or non–volatile." *Id.* at 7 (citing Ex. 1001, 14:54–15:3, 16:26–28, 16:43–46, 16:55–57, Figs. 1, 9).

When interpreting the meaning of a claim, "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)). Patent Owner has, briefly, proposed six claim terms for construction: exhibition; exhibitor; broadcast exhibitor; distribution; marketing; and storing. PO Resp. 10. The Petition states that "[t]o resolve the grounds presented herein, Petitioner does not believe that any term requires explicit construction." Pet. 12.

IPR2024-00736
Patent 7,574,725 B2

We see no reason why "exhibition" and "exhibitor" should be understood as having a meaning as narrow as Patent Owner proposes. "Exhibition" and "exhibitor" encompass more than just a showing by "one in the exhibition business" because the specification of the '725 patent identifies certain "exhibitors" that are *not* "in the exhibition business": e.g., a high school, libraries, and other non-profit organizations. Ex. 1001, 12:38–41 ("schools, libraries, and other non-profit organizations"), Fig. 1 ("high school"). The plain and ordinary meaning of "exhibitors" is at least broad enough to encompass the types of exhibitors identified in the specification: movie theaters, television stations, satellite television operators, cable television operators, and non-profit organizations such as high schools. Ex. 1001, 4:20–22, Fig. 1. We further determine that some of these exhibitor types, including at least satellite and cable television operators, are "broadcast exhibitors."

Moreover, we find that the plain and ordinary meaning of the term "distribution" is not so narrow as to be limited to "the business of marketing *films* and providing copies to venues," as Patent Owner proposes. *See* PO Resp. 10 (emphasis added). The claimed invention is a "method of marketing and distributing *multimedia*," which is not limited to films. We agree with Petitioner that the term is at least broad enough to encompass distribution of any type of multimedia to any type of exhibitor contemplated in the specification. *See* Ex. 1001, 1:20–25 (multimedia types); Reply Br. 6.

Similarly, the plain and ordinary meanings of "marketing" and "storing" are not limited to Patent Owner's specific examples: interesting individuals in seeing a film and saving to non-volatile storage, respectively. *See* PO Resp. 10; Tr. at 57:3–7. The invention is directed to marketing and distributing *multimedia*, not just films, Ex. 1001, 16:21, and while the Specification refers to storing multimedia on "hard drives," *id.* at 4:35–37, 4:44–52, there is nothing in the

15

IPR2024-00736
Patent 7,574,725 B2

Specification, claims, or prosecution history that would limit storage *only* to hard drives or other non-volatile storage.

The intrinsic evidence suggests that the proper construction of each disputed term is considerably broader than that which Patent Owner has proposed. Accordingly, we reject Patent Owner's proposed constructions and instead interpret the challenged claims according to their plain and ordinary meaning.

## IV. OBVIOUSNESS

Petitioner alleges that claims 1, 4–7, 9, and 11 of the '725 patent are unpatentable for obviousness over the cited prior art. Pet. 1, 3. For the reasons discussed below, we determine that Petitioner has provided persuasive evidence and argument in support of its obviousness challenges. We discuss the asserted prior art, and the combination of the prior art, in Section IV.B below. In Sections IV.C.1 and IV.C.2, we consider whether the combination of Garfinkle and Kosten teaches each element of claims 1, 4–7, and 9. In Section IV.C.3, we consider whether the combination of Garfinkle, Kosten, and Allen teaches each element of claim 11. In Section IV.D, we consider Patent Owner's objective evidence of nonobviousness and weigh it against the evidence of obviousness provided by Petitioner.

Because consideration of Petitioner's first two grounds results in unpatentability of all challenged claims, we do not address Petitioner's remaining grounds. *See SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018) (holding a petitioner "is entitled to a final written decision addressing all of the *claims* it has challenged" (emphasis added)); *Boston Scientific Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x. 984, 990 (Fed. Cir. 2020) (non-precedential) (recognizing that the "Board need not address issues that are not necessary to the resolution of the

16

IPR2024-00736
Patent 7,574,725 B2

proceeding" and, thus, agreeing that the Board has "discretion to decline to decide additional instituted grounds once the petitioner has prevailed on all its challenged claims").

### A. Legal Framework

A claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious to one of ordinary skill in the art. *KSR*, 550 U.S. at 406. "Once all relevant facts are found, the ultimate legal determination [of obviousness] involves the weighing of the fact findings to conclude whether the claimed combination would have been obvious to an ordinary artisan." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1361 (Fed. Cir. 2017). Relevant factors include: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness, if present. *See Graham*, 383 U.S. at 17–18. "[O]bjective evidence of nonobviousness includes copying, long felt but unsolved need, failure of others, commercial success, unexpected results created by the claimed invention, unexpected properties of the claimed invention, licenses showing industry respect for the invention, and skepticism of skilled artisans before the invention." *In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998) (internal citations omitted). For objective evidence of nonobviousness to be given substantial weight, "its proponent must establish a nexus between the evidence and the merits of the claimed invention." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010).

IPR2024-00736
Patent 7,574,725 B2

### B. The Asserted Prior Art and Motivation to Combine

We begin with a review of the prior art references cited in Grounds 1 and 2 of the Petition. The relevant references are Garfinkle and Kosten, as well as Allen for Ground 2 only.

#### 1. Garfinkle (Ex. 1005)

Garfinkle discloses a video-on-demand ("VOD") system that provides access at local user sites to catalog data of video products available from a central station. Ex. 1005, 1:54–57. Figure 1 of Garfinkle is reproduced below:



Garfinkle Figure 1 is a block diagram of one embodiment of a video-on-demand system. Ex. 1005, 2:20–22. Central station 10 includes an inventory of video products stored in product store memory 12. *Id.* at 2:40–44. "In addition,

IPR2024-00736
Patent 7,574,725 B2

the central station 10 has a digital data bank 14 in which is stored catalog information identifying the video products available in product store 12 and certain materials related to these products." *Id.* at 2:44–47. The catalog data is periodically transferred to user sites 18, where it is stored. *Id.* at 2:1–3. "This catalog data includes listings of the video products available at the central station, so-called trailers or previews for certain of the video products, and lead-ins for the initial portions of certain products to provide a seamless lead in to program material ordered from the central station." *Id.* at 2:4–8.

In a preferred embodiment, "menu driven software allows a user to control the display of catalog data and to order video products from the central station interactively with displayed catalog material." *Id.* at 2:9–12. Within user site 18, control processor 20 couples catalog store 22 memory and product store 24 memory to video display 26, such as a CRT video display or a LCD video display. *Id.* at 3:19–21. User input device 28 allows the user to "use the catalog data stored in catalog store 22 to, in some cases, preview video products available from the central station 10, and to order any available video product in the catalog store." *Id.* at 3:26–31.

### 2. Kosten (Ex. 1007)

Kosten is a trade journal article that discloses "[i]mproved feature film distribution." Ex. 1007, 54. Kosten includes the following figure:

19

IPR2024-00736
Patent 7,574,725 B2



**FROM STUDIO TO SATELLITE TO A THEATRE NEAR YOU.**

The Kosten figure reproduced above depicts a studio transferring a film to a "CyberStar Network Operations Center," which in turn transmits the film and related content by satellite to a theater, which stores the content on a video server. Ex. 1007, 54. The server is also connected to a "modem for accounting." *Id.* The Figure indicates that the data stored on the video server may be forwarded to one or more theater screens (using a video projector and a digital audio processor), or to one or more lobby displays that show advertising and/or trailers. *Id.*

Kosten describes a system in which "[a] digital film file is simply transferred to and stored in the secure server system of a satellite distribution company, which then 'beams' the film to theatres across the U.S. or around the world, who then store it on their servers for later digital projection." Ex. 1007, 54. Kosten also states that "[i]mproved feature film distribution is only one of the many benefits ushered in by this distribution process. Exhibitors could turn theatre lobbies into smart advertising networks, targeting digital trailers and ad spots based on the demographic of their community and the film itself." *Id.*

IPR2024-00736
Patent 7,574,725 B2

### 3. Asserted Motivation to Combine Garfinkle and Kosten

Petitioner asserts that one of ordinary skill in the art would have been motivated to combine the teachings of Garfinkle and Kosten because "Kosten discloses a business application for Garfinkle's technical implementation." Pet. 14. Specifically, Petitioner proposes the combination reproduced below:



Pet. 15. In this proposed combination, the "central station 10" from Garfinkle Figure 1 (shown above in yellow) would have been used to implement Kosten's "CyberStar Network Operations Center" from the Kosten Figure captioned "From Studio to Satellite to a Theater Near You," and the "user sites 18" from Garfinkle Figure 1 (shown above in blue) would correspond to Kosten's "CyberStar video servers" at individual theaters. Pet. 14–16; Ex. 1002 ¶ 67.

Petitioner contends that a person of ordinary skill in the art would have been motivated to use Garfinkle's video distribution system to implement

21

IPR2024-00736
Patent 7,574,725 B2

Kosten's distribution method to achieve the improvements described therein,

such as:

> access to a large number of video products and advertising materials available at a centralized location (Ex-1007, 54; Ex-1005, 1:42–49, 1:54–2:12), improved advertising capabilities (Ex-1007, 54; Ex-1005, 1:42–49, 1:54–2:12), and improved distribution processes resulting in lower shipping and handling costs and labor intensity, improved security against piracy, wider and more flexible distribution capabilities, cost reductions for movie theaters, increased control over time and locations of exhibitions by studios and distributors, an ability to scale up or down distribution based on success in theaters, and an ability to track and monitor sales and marketing data (Ex-1007, 52, 54).

Pet. 14 (citing *Dystar Textilfarben v. C.H. Patrick*, 464 F.3d 1356, 1368 (Fed. Cir. 2006) (A motivation to combine exists when the "improvement" results in a product or process that is "stronger, cheaper, cleaner, faster, lighter, smaller, more durable, or more efficient.")). Petitioner further asserts that such a person would have had a reasonable expectation of success in achieving the objective of efficient content distribution through the proposed combination of Garfinkle and Kosten with no change in their respective functions because: (1) both are "from the same field and address the same well-known issues"; and (2) both references purport to achieve this objective in similar and predictable ways, "such as using the well-known teachings of digitizing content, correlating multimedia and associated advertising materials, and connecting multiple user sites to the central station through a public communications system." *Id.* at 13, 16–17 (internal citations omitted) (citing Ex. 1005, 2:58–3:5, 3:32–49, 4:37–39; Ex. 1007, 54); Ex. 1002 ¶ 68.

Patent Owner contends that there would have been no motivation to combine Kosten and Garfinkle because each represents a "complete solution[] to different file transport modes, Kosten involving simple file transmission to a

IPR2024-00736
Patent 7,574,725 B2

theater and billboards, and Garfinkle involving file transmission to a [video-on-demand] user. Neither has a problem which is addressed by the other." PO Resp. 33. Petitioner argues, however, and we agree, that "(1) a known technique can provide motivation to combine and (2) a known technique does not need to improve upon the primary reference—it just must be a 'suitable option.'" Reply Br. 21 (citing *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380–81 (Fed. Cir. 2023)). Thus, it does not matter that Kosten and Garfinkle each represent a complete and functional solution to digitally transporting media files. If the references in the combination address a known problem, such as issues with multimedia distribution, *see* Pet. 13–14, and the proposed combination is a suitable solution, then there would have been a motivation to combine the two references. Moreover, Petitioner persuasively argues that by combining Kosten and Garfinkle, one of ordinary skill in the art would have been able to achieve benefits such as lower shipping and handling costs, improved security against piracy, wider and more flexible distribution capabilities, an ability to more easily scale distribution up or down as needed, among other benefits. Pet. 14. We find that these benefits would have provided a sufficient motivation to combine Garfinkle's technical implementation of a distribution process for large multimedia files with Kosten's proposed business application, "beaming" films directly to theaters via satellite. Patent Owner's arguments to the contrary are without merit.

  *4. Allen (Ex. 1006)*

  Allen discloses a system in which remote sites consisting of either video retail stores or a cable television head end allow customers to preview and order movies for rental and sale from video kiosks. The selected movie is then either retrieved from local cache storage or downloaded from a central distribution site

IPR2024-00736
Patent 7,574,725 B2

for manufacturing onto a blank or reused videotape. Ex. 1006, code (57). The invention in Allen is "a system for capturing, storing and retrieving movies recorded in a video format and stored in a compressed digital format at a central distribution site." *Id.* at 3:19–22. "Also captured by the video capture center are materials associated with each movie such as movie previews, movie labels, movie sell-through artwork in digital, analog and photographic forms." *Id.* at 9:16–21. "The digitized versions of the movies, and the associated artwork and previews, are all identified and tracked through a relational database." *Id.* at 9:24–29, 9:55–59.

Allen also discloses an "accounting and transaction engine 109 [that] accounts for each transaction at the retail level including revenue accounting, customer demographic information database, support inventories and the retail outlet financial accounting." Ex. 1006, 10:39–43. Allen explains that "[w]ith this facility, studios can monitor their individual financial data, sales results and promotion results from the retail level on a real time basis. In addition, the retail outlets shall be able to monitor their own financials on a real time basis." *Id.* at 11:17–20.

*5. Asserted Motivation to Combine Allen with Garfinkle and Kosten*

Petitioner asserts that like Garfinkle and Kosten, Allen discloses "a video distribution system comprising a centralized host data center that receives multimedia and associated advertising materials from studios . . . [and] a movie storage facility that stores multimedia and associated advertising material in digital format." Pet. 41 (citing Ex. 1006, code (57), 9:7–30, 9:65–10:22). Petitioner argues that "[a] POSITA would have had a reasonable expectation of success in achieving the objective of efficient content distribution by combining the teachings of Garfinkle, Kosten, and Allen with no change in their respective

IPR2024-00736
Patent 7,574,725 B2

functions because the references purport to solve these problems in similar and predictable ways." *Id.* at 44.

Regarding Allen's "accounting and transaction engine," *see* Ex. 1006, 3:48–51, Petitioner explains that in the proposed combination, "Garfinkle's 'central station 10' . . . , similar to Allen's 'host data center 10' . . . , would incorporate Allen's 'accounting and transaction engine 109' to monitor, account, and report sales and marketing data related to multimedia materials and associated advertising materials." Pet. 42.

According to Petitioner, "[a] POSITA would have been motivated to implement the methods described by Kosten and Allen using the video distribution system described by Garfinkle to provide the additional improvements described in Allen." *Id.* at 41; *see also* Reply Br. 21; Ex. 1022 ¶ 45. Those benefits allegedly include "electronic banking capabilities to track the payment of royalties and copyright fees to movie owners and transfer electronic funds . . . , interoperability between user sites by collecting and maintaining identification and demographic data for customers . . . , and improved advertising capabilities." Pet. 42 (citing Ex. 1006, 3:51–53, 10:43–60, 11:4–10).

Patent Owner contends that one of ordinary skill in the art would not have been motivated to combine the teachings of Garfinkle, Kosten, and Allen because Allen discusses sales data only, and does not discuss marketing data. PO Resp. 50–51. We do not agree that this is the case. For example, Allen explains that with accounting and transaction engine 109, "studios can monitor their individual financial data, sales results *and promotion results* from the retail level on a real time basis." Ex. 1006 at 11:17–20 (emphasis added). We consider financial data about "promotion results" to be marketing data. Allen thus discloses tracking both sales and marketing information. More importantly, Patent Owner does not

IPR2024-00736
Patent 7,574,725 B2

explain why a failure to track marketing data would have discouraged one of ordinary skill from adding Allen to the combination of Garfinkle and Kosten to achieve the benefits identified by Petitioner. *See* Pet. 41–42. In the absence of any evidence to the contrary, we find that Petitioner has persuasively shown that there would have been a motivation to combine Allen with Garfinkle and Kosten.

### C. Analysis of Prior Art Teachings of the Claim Limitations

We next consider whether the cited prior art's teachings and disclosures teach the limitations of the challenged claims of the '725 patent.

### 1. Independent Claim 1

We conclude, for the reasons discussed below, that Petitioner has shown by a preponderance of the evidence that the combination of Garfinkle and Kosten teaches each element of independent claim 1 arranged as recited in the claim.

The preamble to claim 1 reads: "A method of marketing and distributing multimedia." Ex. 1001, 16:19. Petitioner asserts that Garfinkle discloses this preamble by describing "a video-on-demand system . . . that provides the user with a menu of options to assist him or her in identifying, previewing, and ordering a video product from the central station library." Pet. 17; Ex. 1005, 1:58–62. Petitioner further argues that Kosten discloses a method of distributing multimedia from studio via satellite to exhibitors, and also "discloses the marketing of multimedia content by explaining that '[e]xhibitors could turn theatre lobbies into smart advertising networks.'" Pet. 17–18 (citing Ex. 1007, 54).

Patent Owner argues that "Petitioner's seeking to equate distribution to file transfer is an untenable position for a Patent dealing with structure and methodology to be deployed in the film distribution business." PO Resp. 21. According to Patent Owner, the video-on-demand system described in Garfinkle

IPR2024-00736
Patent 7,574,725 B2

is neither "distribution" nor "exhibition" as Patent Owner construes those terms. *Id.* at 20–21 (discussing "'distribution' as understood in the film business"); *see also id*. at 17–18 (stating that the phrase "[m]arketing and distribution" is "used in the Patent to designate the process of getting a film from the studio to the movie house"). We are not persuaded by Patent Owner's arguments because we have not adopted Patent Owner's claim constructions. *See* Section III above.

Garfinkle describes a system that "provides the user with a menu of options to assist him or her in identifying, previewing, and ordering a video product from the central station library." Ex. 1005, 1:58–62; *see also id.* at 1:8–11, 2:1–8, Fig. 1. In other words, the Garfinkle system enables the marketing and distribution of video products and related advertising materials. *See* Pet. 17; Ex. 1002 ¶ 70. Similarly, Kosten discloses both a method of distributing multimedia from studio to satellite to exhibitors and the marketing of multimedia content by turning theater lobbies into smart advertising networks. Ex. 1007, 52, 54; *see* Pet. 17–18. Thus, to the extent that the preamble is limiting, both Garfinkle and Kosten teach the recitation therein.

### *a) Element 1[a]*

Element 1[a] reads: "receiving, by a server, multimedia material and advertising material from a producer or owner of said multimedia material, said advertising material being associated with said multimedia material, said advertising material comprising audio and video components." Ex. 1001, 16:21–25. Petitioner argues that both Garfinkle and Kosten disclose this element, either alone or in combination. Pet. 18–22. Patent Owner does not specifically argue otherwise. *See generally* PO Resp. 17–29; Sur-Reply Br. 16–25.

Both Garfinkle and Kosten describe transferring multimedia material and correlated audiovisual advertising material "by a server." *E.g.*, Ex. 1005, 2:39–

IPR2024-00736
Patent 7,574,725 B2

44, Fig. 1 (Garfinkle central station 10); Ex. 1007, 54 (Kosten CyberStar Network Operations Center). Petitioner argues that one of ordinary skill in the art "would have understood that Garfinkle's 'central station' (i.e., server) receives the 'video products' (i.e., multimedia material) and 'related material such as a trailer' (i.e., associated advertising material) from the content's producer or owner." Pet. 19; *see* Ex. 1002 ¶ 73; Ex. 1005, 4:37–46. Petitioner also argues that Kosten teaches "[a] digital film file is simply transferred to and stored in the secure server system." Ex. 1007, 54, *quoted in* Pet. 20. Both of these points are unrebutted. Accordingly, we determine that the evidence supports Petitioner's showing that the combination of Garfinkle and Kosten teaches element 1[a].

### b) Element 1[b]

Element 1[b] reads: "storing said multimedia material and associated advertising material on a computer readable storage medium as correlated information in digital format." Ex. 1001, 16:26–28. Patent Owner does not dispute that the combination of Garfinkle and Kosten discloses this element. *See generally* PO Resp. 17–29; Sur-Reply Br. 16–25.

The Specification explains that in the '725 invention, "the operator of the system inputs an identifier, such as a title of a movie, associated with the material to be entered, converted, and stored on storage media." Ex. 1001, 4:59–62. Petitioner argues that "[b]ecause Garfinkle similarly assigns catalog data fields to associate a video product's name and address with related materials, a POSITA would have understood that the catalog data correlates the video products with their related materials." Pet. 23. Furthermore, Garfinkle discloses that "the catalog store and product store may physically reside in a single digital memory that is functionally addressable as catalog memory space and product store memory space." Ex. 1005, 3:15–19. Petitioner asserts that this constitutes storage

IPR2024-00736
Patent 7,574,725 B2

on a computer readable storage medium. Pet. 22. We are persuaded by Petitioner's arguments and supporting evidence, which are unrebutted, and conclude that the combination of Garfinkle and Kosten discloses element 1[b].

### c) Element 1[c]

Element 1[c] reads: "providing a server system accessible over a communication network, said server system accessing said correlated information in a digital format from said computer readable storage medium for transfer of said correlated information in a digital format over said communication network to potential purchasers." Ex. 1001, 16:29–34. Garfinkle discloses a communication network, shown as dash line 16 of Garfinkle Figure 1. Ex. 1005, Fig. 1. "The link 16 may be copper wire of the type used by the telephone company, a radio frequency wireless communications link of the type used in satellite-to-earth communications, a coaxial cable, a fiber optic cable, cellular wireless or other suitable link." *Id.* at 2:60–64. The link connects the central station 10 to a plurality of user sites 18, thereby allowing a user to "order video products from the central station interactively with displayed catalog material." *Id*. at 2:58–60, 2:11–12; *see* Ex. 1002 ¶¶ 81–82.

As with element 1[b], Patent Owner does not dispute that the combination of Garfinkle and Kosten, and specifically Garfinkle, discloses element 1[c]. *See generally* PO Resp. 17–29; Sur-Reply Br. 16–25. Accordingly, we determine that the evidence supports Petitioner's showing that the proposed prior art combination teaches element 1[c].

### d) Element 1[d]

Element 1[d] reads: "providing samples of said correlated information in a digital format from said server system over said communication network to said potential purchasers, said purchasers being linked to the server system through

29

IPR2024-00736
Patent 7,574,725 B2

said communication network." Ex. 1001, 16:35–39. Petitioner argues, and Patent Owner does not dispute, that Garfinkle discloses this element. Pet. 26–27; *see generally* PO Resp. 17–29; Sur-Reply Br. 16–25.

Garfinkle teaches that "[a] user input device 28 interacts with the catalog data . . . to allow the user to use the catalog data stored in catalog store 22 to, in some cases, preview video products available from the central station 10, and to order any available video product in the catalog store." Ex. 1005, 3:26–31. The preview content includes trailers and lead-ins, which are "an initial segment of the video product" that is "on the order of two minutes long." *Id.* at 4:17–22; *see also id.* at Abstract, 2:1–7, 3:59–62, 4:55–58. Thus, the evidence of record supports Petitioner's showing that the proposed combination of Garfinkle and Kosten discloses element 1[d].

### e) Element 1[e]

Element 1[e] reads: "downloading to said purchasers, upon request of said purchasers, over said communication network, said correlated information in a digital format corresponding to said multimedia material from said server system, said purchasers storing downloaded correlated information in a digital format corresponding to said multimedia material." Ex. 1001, 16:40–46. Petitioner contends that Garfinkle discloses this element. Pet. 27–28.

Patent Owner concedes that "Garfinkle's system can stream a multimedia film," but argues that this element is not satisfied because "Garfinkle does not enable the recipient to later playback the same to an exhibition audience." PO Resp. 22. Element 1[e], however, does not require playback to an exhibition audience; that limitation is found in element 1[g], which is discussed in Section IV.C.1.g below. Regarding element 1[e], Garfinkle provides that "[v]ideo products are downloaded by the central station from the product store 12 to a

IPR2024-00736
Patent 7,574,725 B2

selected user site 18 in response to a download request from that particular user site." Ex. 1005, 3:11–14; *see also id.* at 2:67–3:2 ("Preferably, data is downloaded from the central station to the user sites in a compressed digital data stream."). These passages disclose every aspect of element 1[e].

### f) Element 1[f]

Element 1[f] reads:

> providing said correlated information in a digital format corresponding to said advertising material that is associated with said multimedia material to said purchasers from said server system over said communication network, allowing purchasers to locally market and sell said multimedia material, said purchasers downloading said correlated information in a digital format corresponding to said advertising material that is associated with said multimedia material, said purchasers storing the downloaded correlated information in a digital format corresponding to said advertising material."

Ex. 1001, 16:47–57.

Petitioner contends that the combination of Garfinkle and Kosten teaches this element. Pet. 28–32. First, Petitioner argues that a person of ordinary skill in the art would have been motivated to implement Garfinkle's system to allow purchasers "to locally market and sell said multimedia material." Pet. 29. Petitioner's declarant, Dr. Houh, testifies that "a POSITA would have understood that the purchasers may include exhibitors that exhibit the multimedia material in a public theater to a number of individuals in exchange for a paid admission or broadcast exhibitors." Ex. 1002 ¶ 96. According to Petitioner, "[b]ecause Garfinkle discloses a system allowing a purchaser to download a movie to a 'user site,' such as a theater, for display, it would have been obvious for the purchaser to locally market and sell admissions to the movie's exhibition." Pet. 29; Ex. 1002 ¶¶ 89–90.

31

IPR2024-00736
Patent 7,574,725 B2

Next, Petitioner argues that Kosten also teaches this element, disclosing that distribution is "not only the vital link between the studios and exhibitors and, by extension, the audience, but also a key component of the revenue stream and the business model of these industries." Pet. 30; Ex. 1007, 52. Kosten also provides that "[e]xhibitors could turn theatre lobbies into smart advertising networks, targeting digital trailers and ad spots based on the demographic of their community and the film itself." Ex. 1007, 54. Petitioner concludes, "[t]hus, a POSITA would have been motivated to use Kosten's theater as a 'user site' in Garfinkle's system . . . and allow purchasers to locally market and sell . . . multimedia material." Pet. 31; Ex. 1002 ¶¶ 89–92, 97 ("[A] POSITA would have understood that Kosten's theaters charge admission for the exhibition of movies to generate a 'revenue stream.'").

Patent Owner raises several arguments in response. Regarding Garfinkle, Patent Owner argues that the reference "fails to disclose anything relating to structure or methodology enabling purchasers to locally market film using the advertising material, for example storage. Moreover, there is no disclosure of any use of advertising material other than its initial display to the VOD customer." PO Resp. 22. According to Patent Owner, "Garfinkle, being a VOD system, is not even concerned with the problem of marketing to third parties." PO Resp. 26.

Regarding Kosten, Patent Owner contends that "[w]hile it appears that trailers and apparently unrelated advertising are sent from Kosten's 'Network Operations Center' with a '*live* broadcast capability' (emphasis added [by Patent Owner]) through a video server to 'lobby displays,' there is no disclosure of control of the lobby displays by the theater owner for marketing feature film." PO Resp. 23. Patent Owner's theory is that the in-theater storage disclosed in Kosten only relates to the main multimedia material (the film) and not to the correlated

32

IPR2024-00736
Patent 7,574,725 B2

advertising materials. *Id.* at 24–25 ("Kosten mentions nothing relating to advertising being stored for later use by the theaters to market the film.").

We find that Garfinkle discloses that advertising materials correlated with a particular film are downloaded and stored, but does not expressly teach that this is for the purpose of "allowing purchasers to locally market and sell said multimedia material." *See* Ex. 1001, 16:51–52. Petitioner argues that this potential use of the downloaded material is implied and would have been obvious to one of ordinary skill in the art. *See* Pet. 29; Ex. 1002 ¶¶ 89–90. We conclude, however, that we need not determine whether Garfinkle's implied disclosures would be sufficient to disclose element 1[f], because the element is disclosed in Kosten and therefore is present in the asserted combination of Garfinkle and Kosten.

Kosten unambiguously discloses that film-related advertising and trailers are both downloaded and stored for the purpose of "additional revenue generation," i.e., marketing the film to increase ticket sales. Patent Owner's arguments to the contrary are based on a misreading of the Kosten figure reproduced in Section IV.B.2 above. The relevant subsection of that figure is reproduced again below.

IPR2024-00736
Patent 7,574,725 B2



Ex. 1007, 54. As shown in the figure reproduced above, Kosten describes a theater in which a purchaser downloads and stores content on a "CyberStar video server." In the figure, the server is clearly located in the box denoting the "Theater" rather than in the boxes denoting the "Studio" or the "CyberStar Network Operations Center."[4] *Id.* Directional lines lead from the content server through a structure represented by a cylinder to multiple screens within the theater or in the theater lobby, indicating that the downloaded content stored on the server is displayed on one or more "Theater screen[s]" *and/or* on one or more "Lobby displays." *Id.* A note beneath the lobby display depicted in the figure reads "[a]dditional revenue generation (Advertising, trailers)." *Id.* This indicates

---

[4] The evidence thus does not support Patent Owner's argument that "Kosten's exhibitors are not provided with storage they control. Rather, storage and display systems are under the control of the website operator and thus exhibitors are incapable of the recited second-tier local marketing as claimed in claim 1." Sur-Reply 17; *see also* Tr. 40:15–17.

IPR2024-00736
Patent 7,574,725 B2

that the digital content downloaded and stored on the local server includes advertising and trailers as well as feature films. Thus, Kosten expressly discloses purchasers downloading and storing advertising materials correlating with a particular film for the purpose of "locally market[ing] and sell[ing] said multimedia material." *See* Ex. 1001, 16:51–52. We are not persuaded by Patent Owner's arguments, and we conclude that Kosten's teachings disclose element 1[f].

> *g) Element 1[g]*

Element 1[g] reads:

> wherein said purchaser is an exhibitor exhibiting said multimedia material, after deriving said multimedia material from said stored correlated information in a digital format corresponding to said multimedia material, in a public theater to a number of individuals in exchange for a paid admission or a broadcast exhibitor, said advertising material, after deriving of said advertising material from said correlated information in a digital format corresponding to said stored associated advertising material, being shown to the public at a time or in a place different from the time and place at which said associated multimedia material is displayed.

Ex. 1001, 16:58–17:2. In other words, element 1[g] requires that: (1) the purchaser must be either an exhibitor in a public theater who is charging for admission or a broadcast exhibitor; and (2) the advertising material must be shown to the public at a different time or place than the associated multimedia material. *Id.* Petitioner argues that Garfinkle discloses at least a purchaser deriving multimedia and advertising materials from stored correlated information in a format, and that the remaining requirements of element 1[g] are taught by Kosten. *See* Pet. 32–36; Reply Br. 17.

Patent Owner contends that "Garfinkle clearly does not meet the recitation of a purchaser being an exhibitor exhibiting the multimedia material in a public

IPR2024-00736
Patent 7,574,725 B2

theater to a number of individuals or a broadcast exhibitor" because "[e]xhibition necessarily involves a publicly accessible space, something which is the opposite of video-on-demand." PO Resp. 28. Patent Owner further argues that there is "nothing in Garfinkle either alone or in combination with Kosten which shows or suggests a two-tier exhibitor/end-user system with storage and file transport structures enabling marketing through the provision of advertising materials to the theater owner." *Id.* Patent Owner's arguments are a product of Patent Owner's unsupported and overly narrow constructions of the terms "exhibition" and "marketing," constructions that we have already rejected in Section III above. Whether or not Garfinkle discloses an "exhibition" or a "two-tier" system (neither term is recited in claim 1), when Kosten is added to Garfinkle the resulting combination certainly discloses "an exhibitor exhibiting said multimedia material," as well as the remaining requirements of element 1[g].

The first requirement that a purchaser must be either an exhibitor in a public theater who is charging for admission or a broadcast exhibitor, is admittedly taught by Kosten, which depicts exhibition of multimedia in a theater by means of a video projector and a digital audio processor. Ex. 1007, 54; *see* Tr. 40:14 ("Kosten certainly does show a public theater, but that's all he shows."); Sur-Reply Br. 15 ("Kosten does show a theater, as well as electronic file transfer"). Since "a POSITA would have understood that Kosten's theaters charge admission for the exhibition of movies to generate a 'revenue stream,'" Ex. 1002 ¶ 97, we determine that the figure in Kosten illustrates a public theater exhibiting films to paying customers.[5]

---

[5] With regard to the possibility that "said purchaser" is "a broadcast exhibitor," it is a "long-established rule that claims which are broad enough to read on obvious subject matter are unpatentable even though they also read on nonobvious subject

IPR2024-00736
Patent 7,574,725 B2

Kosten also meets the second requirement that the advertising material must be shown to the public at a different time or place than the associated multimedia material. Specifically, Kosten discloses that "[e]xhibitors could turn theatre lobbies into smart advertising networks . . . no longer will they be stuck with standard trailers attached to each celluloid print." Ex. 1007, 54. Patent Owner argues that neither Garfinkle's VOD system nor "the billboards of Kosten" meet "the meaning of the language [of] Claim 1 relating to the time or place for the display of advertising relative to the feature film." PO Resp. 28. Kosten, however, unambiguously depicts "advertising material, trailers" being shown in a theater "lobby," a place different from the "theater screen" where the associated multimedia material is displayed.[6] Ex. 1007, 54.

Petitioner asserts that "[a] POSITA would have been motivated to use Kosten's movie theater as a user site in Garfinkle's system and exhibit advertising materials in the theater lobby or on theater screens at a different time or place than the associated movie." Pet. 35–36. In light of Kosten's description of the advantages of "turn[ing] theatre lobbies into smart advertising networks,"

---

matter." *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1281 (Fed. Cir. 2015), *aff'd sub nom. Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261 (2016) (internal punctuation omitted); *accord In re Lintner*, 458 F.2d 1013, 1015 (C.C.P.A. 1972); *In re Mraz*, 455 F.2d 1069, 1072–73 (C.C.P.A. 1972). Claim 1 requires the purchaser to be one of two alternative options: (A) an exhibitor exhibiting the multimedia material in a public theater; or (B) a broadcast exhibitor. Because option A reads on Kosten, it does not matter whether option B also reads on any of the cited prior art.

[6] Because option B (a different place) reads on Kosten, it does not matter whether option A (a different time) also reads on any of the cited prior art. *See In re Cuozzo*, 793 F.3d at 1281 ("[C]laims which are broad enough to read on obvious subject matter are unpatentable even though they also read on nonobvious subject matter.").

IPR2024-00736
Patent 7,574,725 B2

Ex. 1007, 54, we determine that the evidence of record supports Petitioner's argument. Accordingly, we find that one of ordinary skill in the art would have been motivated to combine Garfinkle with Kosten and that the resulting combination discloses the requirements of element 1[g].

### h) Summary Regarding Claim 1 of the '725 Patent

The evidence of obviousness discussed above supports the conclusion that all the limitations of claim 1 are taught by the prior art and that there is a rationale to combine Garfinkle with Kosten. Patent Owner's evidence of nonobviousness, our weighing of the evidence as a whole, and our ultimate conclusion regarding the obviousness of claim 1 are discussed in full in Section IV.D below.

### 2. Dependent Claims 4–7 and 9

For dependent claims 4–7 and 9 of the '725 patent, Petitioner contends that the combination of Garfinkle and Kosten discloses each additional limitation in each dependent claim. Pet. 36–40. Patent Owner disputes this for claims 4 and 5 only. We determine that Petitioner has shown by a preponderance of unrebutted evidence that the combination of Garfinkle and Kosten discloses each element of dependent claims 6, 7, and 9.

Claim 4 recites: "The method of marketing and distributing multimedia of claim 1, wherein said server system is accessed over a public communications system." Ex. 1001, 17:11–13. The Specification states that "[i]n conventional form, the inventive method of marketing and distributing multimedia includes the option of providing a server system accessible over a public communication system, such as the Internet." *Id.* at 3:13–17. Based on this sentence, Patent Owner seems to conclude that *only* the Internet would qualify as "a public communication system," arguing that "[n]either cellular nor copper telephone

IPR2024-00736
Patent 7,574,725 B2

systems, *per se*, are 'such' a type of communication system as the Internet." PO
Resp. 30–31. Like Patent Owner's other proposed claim constructions, we find
this definition to be both unsupported and overly narrow. Garfinkle provides that
its "data link 16" may be, for example, "a telephone company copper wire link,"
"a radio frequency wireless communications link," or a "cellular wireless"
network. Ex. 1005, 1:25–30, 2:58–67. We find that any of these would qualify as
"a public communications system," and that therefore the combination of
Garfinkle and Kosten discloses the additional limitation of claim 4.

Claim 5 recites: "The method of claim 1, wherein the exhibition of
multimedia material is the public showing of a motion picture." Ex. 1001, 17:14–
15. As with claim 1, Patent Owner argues that the prior art does not disclose "the
public showing of a motion picture" because "Garfinkle does not involve the
exhibition of [a] motion picture, but rather is in the field of video-on-demand
delivering products to sites of end-users." PO Resp. 31. As discussed above in
connection with element 1[g], Kosten discloses exhibiting digital multimedia,
specifically "films," on theater screens. Ex. 1007, 54 ("Improved feature film
distribution is only one of the many benefits ushered in by this distribution
process."). We find that the "films" discussed in Kosten are "motion pictures."
*See id.* at 53–54 (naming *Star Wars Episode I*, *The Blair Witch Project*, and
*Tarzan* as examples). Thus, the combination of Garfinkle and Kosten discloses
the additional limitation of claim 5.

The evidence of obviousness discussed above supports the conclusion that
all the limitations of dependent claims 4 and 5 are taught by the prior art. Patent
Owner's evidence of nonobviousness, our weighing of the evidence as a whole,
and our ultimate conclusion regarding the obviousness of claims 4–7 and 9 are
discussed in full in Section IV.D below.

IPR2024-00736
Patent 7,574,725 B2

### 3. Dependent Claim 11

The remaining challenged claim, dependent claim 11, recites: "The method of marketing and distributing multimedia of claim 1, further comprising automatically collecting sales information from exhibitor recipients of various items of said multimedia material and providing sales and marketing data, specific to said items of multimedia material, to exhibitors based upon information from said exhibitors." Ex. 1001, 17:33–38. Petitioner argues in Ground 2 of the Petition that the combination of Garfinkle, Kosten, and Allen discloses each limitation of claim 11. Pet. 44–46; Reply Br. 18–19. According to Petitioner, the combination of Garfinkle and Kosten discloses each limitation of claim 1 for the reasons previously discussed, and Allen discloses the additional limitations of dependent claim 11. *See* Pet. 42 ("This combination builds on the combination of Garfinkle and Kosten discussed above.").

Petitioner argues that "Allen discloses a 'host data center 10' similar to Garfinkle's 'central station 10' and Kosten's 'CyberStar Network Operations Center.'" Pet. 44 (citing Ex. 1006, Fig. 1; Ex. 1005, Fig. 1; Ex. 1007, 54). Within host data center 10, Allen discloses an "accounting and transaction engine 109." Ex. 1006, 6:50–60, Fig. 1. Petitioner proposes that one of ordinary skill in the art at the time of the claimed invention would have been motivated to incorporate the accounting and transaction engine 109 of Allen into the central station 10 of Garfinkle. Pet. 40–43.

IPR2024-00736
Patent 7,574,725 B2

Petitioner suggests that the resulting combination would have taken the form reproduced below:



Pet. 43. Petitioner's diagram, shown above, depicts Kosten's "Studio" providing films to Garfinkle's central station 10 (shown in yellow), which is connected to Allen's accounting and transaction engine as well as to product store 12 and catalog store 14. *Id.* Dash line 16 (shown in green) connects central station 10 to a plurality of user sites 18 (shown in blue), one of which is Kosten's "Theater," which contains a storage server and a plurality of theater screens and lobby displays. *Id.*; Ex. 1002 ¶ 67.

As described in Allen, the accounting and transaction engine "accounts for each transaction at the retail level including revenue accounting, customer demographic information database, support inventories and the retail outlet financial accounting." Ex. 1006, 10:39–43. Petitioner argues that Allen's collected "revenue accounting" information is equivalent to the "sales data" of claim 11, while the collected "customer demographic information database"

IPR2024-00736
Patent 7,574,725 B2

constitutes "marketing data." Pet. 45. Allen teaches that as a result of this data collection, "studios can monitor their individual financial data, sales results and promotion results from the retail level on a real time basis. In addition, the retail outlets [can] monitor their own financials on a real time basis." Ex. 1006, 11:17–20.

Patent Owner states that "claim 11 recites, in addition to the collection of sales information, the provision of marketing data to exhibitors based upon information from exhibitors." PO Resp. 46. Patent Owner does not appear to contest that Allen's accounting and transaction engine collects sales data, but contends that Allen does not collect and then provide its exhibitors with *marketing* data. In its Reply, Petitioner merely repeats the passage in Allen teaching that "studios can monitor their individual financial data, *sales results and promotion results* from the retail level on a real time basis" and "the *retail outlets* shall be able to monitor their own financials on a real time basis." Reply Br. 18–19 (quoting Ex. 1006, 11:15–20 with emphasis added by Petitioner).

We are persuaded that Allen discloses collecting sales data ("studios can monitor their . . . sales results") as well as marketing data ("studios can monitor their . . . promotion results from the retail level"). Ex. 1006, 11:17–19. We are also persuaded that Allen discloses providing to exhibitors at least the sales data "based upon information from said exhibitors." Ex. 1001, 17:36–38. Our understanding is based on Allen's disclosure that "the retail outlets shall be able to monitor their own financials on a real time basis." Ex. 1006, 11:17–20. While this sentence plainly includes sales data, it is not entirely clear whether a retail outlet's "own financials" refers only to sales data or also includes "promotion results from the retail level," which we find would qualify as marketing data. Here, Allen is ambiguous.

IPR2024-00736
Patent 7,574,725 B2

Petitioner's argument, however, is that claim 11 would have been obvious in light of the *combination* of Garfinkle, Kosten, and Allen. As Petitioner's counsel explained at oral argument, Kosten teaches a "smart advertising function" that depends on customer demographic information. Tr. 19:6–14; Ex. 1007, 54 ("Exhibitors could turn theatre lobbies into smart advertising networks, targeting digital trailers and ad spots based on the demographic of their community and the film itself— no longer will they be stuck with standard trailers attached to each celluloid print."). Allen teaches collecting such customer demographic information and storing it in a database. Tr. 17:12–14; Ex. 1006, 10:39–43. As Petitioner's counsel argued:

> Allen doesn't say that it gets provided to the exhibitors, but in the combination, we have an exhibitor that uses demographic information, and so one of skill in the art would have understood that the information that's collected and stored in the database of the central station would've been provided to Kosten so that it can do its smart advertising function, that is specifically calling for demographic information.

Tr. 17:14–19; *see also* Pet. 40–41 (noting Kosten's smart advertising networks as part of rationale to combine). We find this argument persuasive.

The evidence of obviousness discussed above supports the conclusion that all the limitations of claim 11 are taught by the prior art and that there is a rationale to combine Garfinkle, Kosten, and Allen. Patent Owner's evidence of nonobviousness, our weighing of the evidence as a whole, and our ultimate conclusion regarding the obviousness of claim 11 are discussed in full in Section IV.D below.

### D. Objective Evidence of Nonobviousness

In Section IV.C, we determined that Petitioner has sufficiently shown that the asserted prior art teaches or suggests each element of every challenged claim.

IPR2024-00736
Patent 7,574,725 B2

We now discuss the objective evidence of nonobviousness submitted by Patent Owner in more detail.

Although Patent Owner's Sur-Reply contains a section with the heading "Secondary Considerations," the only argument made in that section is based on a declaration by the inventor, Nick Stiliadis, testifying that at the time of the invention, he had a personal relationship with Cyril Drabinsky and William Townsend of Deluxe Entertainment Services, "at that time one of the two largest motion picture laboratories in the world." Ex. 2109 ¶ 5. Mr. Stiliadis testifies that he had a conversation with Mr. Drabinsky and Mr. Townsend, in which he described the technology in his pending patent and suggested that Deluxe should adopt it. *Id.* ¶ 7. Mr. Stiliadis states that "Townsend and Drabinsky disagreed, outright saying that due to technical challenges, digital was not practical and would not be practical for many, many years. This mirrored then current technological concerns respecting aesthetics and file transport." *Id.* ¶ 8. Patent Owner argues that "[c]learly, the rejection of the feasibility of electronic file transfer was a prejudice in the art which prevented others from running with the idea and developing technologies which rested on it." Sur-Reply Br. 26.

We understand Patent Owner to be asserting as objective evidence of nonobviousness "skepticism of skilled artisans" at the time of the invention. *See In re Rouffet*, 149 F.3d at 1355. We further understand Patent Owner to be asserting that Mr. Drabinsky and Mr. Townsend were "skilled artisans." We find that this argument is not supported by the evidence.

First, there is no evidence that in the year 2000 Mr. Drabinsky and Mr. Townsend were persons of ordinary skill in the relevant art as that term has been defined in this Decision. *See* Section II.E.1 above. Mr. Drabinsky is described as "President, North America" of Deluxe, with an educational background in "commerce and finance" and in law. Ex. 2109 ¶ 5; Ex. 2102, 2.

IPR2024-00736
Patent 7,574,725 B2

Mr. Townsend is described as "Vice President of Laboratory Sales" at Deluxe,
with a career as an administrator in various music publishing companies.
Ex. 2109 ¶ 5; Ex. 2101. There is no evidence that either individual possessed "a
Bachelor of Science degree in electrical engineering, computer engineering,
computer science, or a related field plus one year of experience related to
marketing and distribution of multimedia material over a computer network, or
the equivalent." *See* Section II.E.1 above. Thus, while both may have been
businessmen knowledgeable about the movie industry generally, neither would
have qualified as a "skilled artisan" capable of assessing the merits of the
technology in the '725 patent.

    Moreover, for objective evidence of nonobviousness to be given
substantial weight, "its proponent must establish a nexus between the evidence
and the merits of the claimed invention." *Wyers*, 616 F.3d at 1246. Patent Owner
does not address the nexus requirement. The evidence cited in Patent Owner's
Sur-Reply merely states that two businessmen concluded that Mr. Stiliadis'
invention "would not be practical for many, many years." Ex. 2109 ¶ 8. This
statement about the practicalities of Mr. Stiliadis' invention by someone other
than a person of ordinary skill in the relevant art has little or no nexus with the
technical merits of the invention. Moreover, it is uncertain how closely the
"invention" discussed at the time corresponds to the ultimately patented subject
matter in the challenged claims. For these reasons, we determine that Patent
Owner has not established a sufficient nexus between the evidence of
nonobviousness presented and the patented subject matter for that evidence to be
given substantial weight.

    For each of the challenged claims, we have weighed the evidence of
obviousness against Patent Owner's evidence of nonobviousness. We find that
the evidence of obviousness is strong and the evidence of nonobviousness is

IPR2024-00736
Patent 7,574,725 B2

weak. On the one hand, we are persuaded that Petitioner has demonstrated a reasonable rationale to combine Garfinkle with Kosten and (for claim 11) with Allen, and that there is sufficient evidence provided that the combination of the references teaches all the limitations of claims 1, 4–7, 9, and 11. On the other hand, we find Patent Owner's objective indicia of nonobviousness unpersuasive and entitled to little weight. Accordingly, we determine that the evidence of obviousness outweighs the objective indicia of nonobviousness. Considering the evidence as a whole, viewed in light of the state of the art at the time of the invention, we conclude that Petitioner has shown by a preponderance of the evidence that claims 1, 4–7, and 9 would have been obvious over the combination of Garfinkle and Kosten, and that claim 11 would have been obvious over the combination of Garfinkle, Kosten, and Allen.

## V. CONCLUSION

Having reviewed the arguments and supporting evidence, and after a full and fair hearing, we hold that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 4–7, and 9 of the '725 patent are unpatentable for obviousness over Garfinkle and Kosten, and that claim 11 of the '725 patent is unpatentable for obviousness over Garfinkle, Kosten, and Allen.

IPR2024-00736
Patent 7,574,725 B2

The following is a summary of the outcome of this proceeding:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 4–7, 9 | 103(a) | Garfinkle, Kosten | 1, 4–7, 9 | |
| 11 | 103(a) | Garfinkle, Kosten, Allen | 11 | |
| 1, 4, 6, 7, 9, 11 | 103(a) | Allen, Budow[7] | | |
| 5 | 103(a) | Allen, Budow, Kosten[8] | | |
| **Overall Outcome** | | | 1, 4–7, 9, 11 | |

VI. ORDER

In consideration of the foregoing, it is hereby

ORDERED that claims 1, 4–7, 9, and 11 of the '725 patent are determined to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is *granted*; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[7] As explained above, because we determine that these challenged claims are rendered obvious in Grounds 1 and 2, we need not address this obviousness ground for these claims.

[8] As explained above, because we determine that this challenged claim is rendered obvious in Ground 1, we need not address this obviousness ground for this claim.

47

IPR2024-00736
Patent 7,574,725 B2

FOR PETITIONER:

Xin-Yi Zhou
William M. Fink
Benjamin Haber
Patric Reinbold
O'MELVENY & MYERS LLP
vzhou@omm.com
tfink@omm.com
bhaber@omm.com
preinbold@omm.com


FOR PATENT OWNER:

Anthony H. Handal
Monami Roy
HANDAL & MOROFSKY LLC
handal@handalglobal.com
mroy@handalglobal.com